Kathleen M. ANDERSON,
Plaintiff–Appellant,

v.

Janet RENO, Attorney General,
Defendant–Appellee.

No. 98–16458.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 13, 1999

Filed Sept. 8, 1999

John G. Heller, Chapman, Popik & White, San Francisco, California, for the plaintiff-appellant.

Michael J. Yamaguchi, Assistant United States Attorney, San Francisco, California, for the defendant-appellee.

Before: FLETCHER and SILVERMAN, Circuit Judges, and WALTER, District Judge.[1]

SILVERMAN, Circuit Judge:

Kathleen Anderson, a 20–year veteran of the FBI, brought a Title VII action alleging sexual harassment in the workplace occurring over many years. In granting the defendant's motion for summary judgment concerning the claim of a hostile work environment, the district court declined to consider any allegedly relevant incident that did not occur within 45 days prior to the initiation of EEO proceedings. We hold today that Anderson has shown that the excluded incidents were part of a pattern of alleged discrimination that also allegedly existed *within* the 45–day period, and thus should have been considered under the continuing violation doctrine. We also hold that Anderson came forward with sufficient evidence to defeat a motion for summary judgment on whether the defendant had a non-discriminatory, non-pretextual explanation relating to the issues of disparate treatment and retaliation. We reverse and remand for trial.

---

**1.** The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

## FACTUAL AND PROCEDURAL BACKGROUND [2]

Kathleen Anderson, who had been a special agent of the FBI for 20 years, brought this action under Title VII alleging that she was sexually harassed by Bureau employees, including some of her supervisors, over a period of 11 years. The district court granted summary judgment in favor of the defendant on all counts. Anderson's claims fall into three main categories: hostile work environment, disparate treatment in the workplace, and retaliation. The following facts—some of which are contested—are drawn from Anderson's own declaration and other materials Anderson submitted in response to the motion for summary judgment.

### A. Hostile work environment

First, Anderson alleges that her supervisors created a hostile work environment. Specifically, she alleges that from 1986 to 1990, William Smith, Anderson's supervisor, called her "gorgeous" and "the good little girl," instead of referring to her by name. He whistled at Anderson, called her "the office sex goddess," "sexy," and told her about her sexual desirability.

In addition to those specific acts of discrimination directed at her, Anderson alleges that she endured similar acts by fellow FBI employees. In 1987, Anderson entered a briefing room to present an arrest plan to her fellow agents. Waiting for her was an easel containing a drawing of a pair of breasts and the words, "Operation Cupcake." Humiliated and embarrassed, Anderson turned to Smith, a supervisor, for assistance. Instead, he said in front of the assembled group, "This is your training bra session."

In 1987, someone left for Anderson a copy of a rejection letter supposedly sent to a female FBI applicant by J. Edgar Hoover that stated, "We do not employ women [because] we must have agents who are qualified to cope with any situation they may face." Handwritten on the note was a message to Anderson: "KMA ... even Big John said it (so it must be so)."

Additionally, Anderson says that she received various vulgar items circulated by unidentified fellow employees including a cartoon depicting varieties of female breasts with her initials scrawled next to an example labeled "cranberries," a copy of an article concluding that women who read "racy" books have more sex, accompanied with a note that read, "KMA—read any good books lately?" and a greeting card that said, "Some of us at the office were wondering ... when you were planning to come into the office naked."

According to Anderson, Smith discouraged her from seeking promotions because people might "misunderstand [her] strong personality" and downgraded her performance. Despite the fact that she had served previously as relief supervisor, Smith constantly passed her over for promotion, selecting men as acting supervisors. Smith also excluded Anderson from critical meetings in her own cases.

In 1990, Anderson asked a fellow agent, Adrian Coulter, to assist her in transferring to the Organized Crime Squad in the San 'Jose office. Eight years earlier, Anderson and Coulter had had a brief consensual sexual relationship. Although he eventually assisted her with the transfer, Coulter continually reminded Anderson of their sexual relationship and asked to rekindle it on numerous occasions. In 1991, Anderson was transferred to the Organized Crime Squad where Coulter worked as an agent. Coulter continued to solicit Anderson for sex, stating that "she owed him."

In July, 1991, Coulter became Anderson's supervisor. Coulter continued to remind Anderson of their previous sexual encounter, telling her that "he was good in bed." During this period, Coulter commented on Anderson's weight and the size

**2.** Because of the procedural posture of this matter, we view the facts in a light most favorable to Anderson.

of her hips, and told her that her husband was "too small" for her. He also told Anderson that he was attracted to another female agent and asked Anderson why the other agent would not sleep around.

Over the next three years, according to Anderson, Coulter made unwanted and sexually suggestive comments to her and discussed women's roles in the FBI. He referred to Janet Reno as Anderson's "sister." Coulter told Anderson that criminals involved in organized crime, the target of the squad's efforts, would not pay attention to women. He then proceeded to exclude her from critical interrogations. After Anderson complained to him about that, Coulter told her that if she wanted better cases, she should "go to the girls at the BNE [California's Bureau of Narcotics Enforcement]."

In 1994, Coulter continued to direct sexually harassing comments to Anderson. In May, Coulter continually pestered Anderson to go drinking with him. The following month, Coulter patted her on the buttocks and told her that she was "putting on weight down there."

### B. Disparate treatment in the workplace

In addition to her claim of being subjected to a hostile work environment, Anderson alleges that she was not treated equally by her supervisors in work assignments and assistance. She claims that while working on an organized crime investigation, Coulter refused to provide her with personnel to monitor an informant and a wiretap that she had set up. This, despite the fact that Coulter provided male agents with the support that they required.

### C. Retaliation

Finally, Anderson claims that her Bureau supervisors retaliated against her for filing EEO complaints. Specifically, she alleges that in 1994, in retaliation for having initiated EEO administrative counseling, she was reassigned to the "Regional Drug Intelligence Squad" (RDIS), a then-nonexistent unit, a move that would impair her chances for advancement. She also alleges that in 1997, after she already commenced her lawsuit, she was transferred from a desirable FBI–DEA joint operation because certain of her co-workers did not want to work with a woman who had filed EEO complaints.

### RULING BELOW

As previously noted, the district court granted summary judgment to the defendants on all counts. With respect to Anderson's hostile work environment claim, the district court declined to consider any incident occurring prior to August 6, 1994. The district court reasoned that any such incident was time-barred because it occurred more than 45 days before Anderson initiated EEO counseling, and could not be considered. *See* C.F.R. § 1614.105(a)(1); *Johnson v. United States Treasury Dep't*, 27 F.3d 415, 416 (9th Cir. 1994) (incidents that occur more than 45 days before informal EEO counseling cannot generally be the basis of a formal complaint). After excluding consideration of the time-barred incidents, the district court concluded as to the remaining evidence that "no reasonable woman would find that these events rendered plaintiff's work environment hostile."

As to the claim of disparate treatment, the district court assumed that the plaintiff had established a prima facie case, but found that Anderson could not rebut the defendant's evidence of a legitimate, non-discriminatory, non-pretextual explanation for not assigning other agents to her organized crime investigation. The defendant had come forward with proof that the decision to refrain from assigning additional agents was made, first, because manpower resources were limited due to holiday vacations and second, because Anderson had been unable to show that her case actually had an organized crime connection that required additional support.

Finally, with respect to the retaliation claims, the district court likewise ruled

that Anderson had been unable to rebut the defendant's factual assertion that the decision to reassign Anderson in 1994 was made for valid reasons by a higher-level supervisor not involved in Anderson's EEO complaints. And, as to the alleged retaliation that occurred in 1997, the district court ruled that Anderson had not exhausted her administrative remedies.

## STANDARD OF REVIEW

 On appeal, we review the evidence de novo in the light most favorable to Anderson to determine whether any genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996).

## DISCUSSION

I. Hostile Work Environment Claim

We first turn to Anderson's hostile work environment claim. In granting the Bureau summary judgment, the district court refused to consider all but four incidents, concluding that the others were time barred.

### A. June–July, 1994 events

The first category of incidents that the district court deemed untimely allegedly occurred in June and July of 1994. Specifically, these incidents included Coulter patting Anderson on the buttocks, commenting on her putting on "weight down there," and his remark that Anderson would attribute a case reassignment to gender bias. The district court concluded that Anderson did not initiate EEO counseling about these events within 45 days of their occurrence. The defendant concedes that Anderson initiated the counseling with Don Allen in May of 1994, but argues that she did not pursue it, was not cooperative with Allen, and that she abandoned the administrative process. The government then asserts that since Anderson did not reinitiate the counseling until September of 1994, the June and July events did not occur within the requisite 45-day period prior to the reinitiated counseling.

 The record belies the government's assertion that Anderson abandoned the process she began in May. To the contrary, it reflects that she met with Allen 13 times between May and September. Although it is true that Anderson asked Allen not to talk to certain individuals with whom she would have to continue working, this does not amount to non-cooperation. The regulations provided Anderson with the right to remain anonymous during her informal counseling. *See* 29 C.F.R. § 1614.105(g).

 Moreover, the informal counseling that Anderson initiated in May was not completed until Anderson was issued a "final interview" letter notifying her of her right to file a complaint. *See Vinieratos v. United States Dep't of Air Force,* 939 F.2d 762, 769 n. 8 (9th Cir.1991) (holding that the "final interview" is of critical importance to the administrative procedure); *see also Counts v. Reno,* 949 F.Supp. 1478, 1483 (D.Haw.1996) (holding that failure to produce employee with notice of "final interview" estops government from relying on failure to exhaust). A final letter was not issued to Anderson until September 20, 1994. The counseling thus remained officially open from May of 1994 until September 20, 1994.

 We also reject the government's suggestion that Anderson did not raise her claims with the EEO counselor. Anderson specifically alleges that she discussed two of the three claims with Allen (Coulter's comment about her putting on weight and his prediction that Anderson would likely complain that gender motivated a case reassignment). As to her third claim, Anderson admits that she did not specifically discuss her allegation that Coulter had patted her on the buttocks; however that conduct is alleged to have occurred in the broader context of the unwanted banter about her physique about which she did complain. It is enough "like or reasonably related" to the other allegations so as not to be barred. *See Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir.1990).

We conclude that the district court erred in excluding from its consideration the three events that Anderson alleged occurred during June and July of 1994, while she was engaged in EEO counseling.

### B. Continuing Violation Doctrine

■ We now turn to the heart of Anderson's appeal. Anderson argues that in ruling on the defendant's motion for summary judgment, the district court erred in declining to consider a host of incidents that occurred from 1986 to 1994 because they were not raised within 45 days of their occurrence by the initiation of informal EEO counseling. Anderson contends that earlier acts of harassment should have been considered by the court under the "continuing violation doctrine"— i.e., that these early occurrences were part of a series of continuing violations that relate to subsequent incidents that *were* the subject of timely administrative proceedings and therefore, not barred. We agree.

■ We have recognized that events occurring outside of the limitations period can form the basis of a Title VII claim as long as the untimely incidents represent an ongoing unlawful employment practice. *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1107 (9th Cir.1998). Moreover, even if not actionable in and of themselves, untimely claims serve as relevant background evidence to put timely claims in context. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

■ To prevail under this theory, Anderson must demonstrate that the untimely incidents are part of a pattern of discrimination and that the FBI continued this pattern into the relevant limitations period. *See Draper,* 147 F.3d at 1107–08; *Sosa,* 920 F.2d at 1455. Anderson can make her showing by presenting evidence that the FBI engaged in a "systematic policy of discrimination" or by presenting evidence of a series of related discriminatory acts directed at her by FBI personnel. *See Sosa,* 920 F.2d at 1455–56.

In *Draper,* a female employee brought a sexual harassment suit against the mining company for which she worked. *Draper,* 147 F.3d at 1105. Draper alleged that over a two-year period, her supervisor subjected her to various forms of sexual harassment. For instance, he made sexual remarks about her, both in and out of her presence. He frequently referred to her as "beautiful" or "gorgeous" in lieu of her name. The supervisor made comments about Draper's physical features and his sexual interest in her and other women. Draper did not complain about certain of the incidents within the 300–day limitations period. However, we held that the untimely incidents were nevertheless actionable because they were related and similar to the timely events, and thus constituted part of a continuing violation. *See id.*

The facts in *Draper* are quite similar to those in this case. In her complaint, Anderson alleges that she regularly endured a host of sexually harassing incidents between 1986 and 1994.

Anderson alleges incidents that include the following:

* In 1986, Smith referred to her as the "office sex goddess," "sexy," and "gorgeous." He reportedly continued this behavior until Anderson's transfer four years later.

* In 1986, Coulter reportedly told Anderson that she was "putting on weight down there." He continued to inform her of his observations again from 1988—1994.

* In 1987, Anderson received a vulgar note and greeting card from anonymous individuals.

* In 1987, Anderson received a copy of a rejection letter supposedly written by J. Edgar Hoover to a female applicant stating, "We do not employ women [because] we must have agents who are qualified to cope with any situation they may face," to which was attached a derisive note addressed to Anderson.

* In 1987, Anderson was subjected to the "Operation Cupcake" incident.

* In 1987, Smith told Anderson that he could not sleep because he was thinking about sex. That same year, and for years to follow, Smith told Anderson of her sexual desirability.

* In 1988, Coulter reminded Anderson of their prior sexual relationship and solicited her for sex. Coulter allegedly repeated these solicitations in 1989–1991.

* From 1987—1989, Anderson received a cartoon depicting varieties of female breasts with her initials scrawled next to the example labeled "cranberries," a greeting card inquiring if and when she would "come into the office naked," several pages to pornographic "976" numbers, a copy of an article concluding that women who read "racy" books have more sex, accompanied by a note that queried as to whether she had read any good books lately.

* In 1989, Coulter informed Anderson that her husband was "too small" for her.

* In 1990, Anderson received an anonymous note that read, "Women serve only on their backs."

* In 1991 and 1992, Coulter repeatedly brought up their past personal relationship, telling her that he was good in bed. Coulter also inquired of Anderson about the sexual proclivities of other female employees.

* In 1992, Smith and Coulter, instead of referring to her by name, regularly called her "dear," "gorgeous," "the good little girl," "sexy," and the like.

* In 1993, Coulter told Anderson that if she wanted better case assignments, she should go to "the girls at BNE."

When these antecedent events are viewed in the context of the totality of her relationship with the FBI, it is apparent that they are part of a pattern that started years ago and that had continued to the time she first made a timely complaint, and even beyond. The offensive conduct that allegedly occurred within the limitations period—her supervisor's repeated comments about Anderson's "putting on weight down there" and patting her on the buttocks, the circulation of the "Women Must Bitch" poster, the tack placed in Anderson's photograph of a statue honoring women FBI agents, the 1994 resurrection of the 1987 Operation Cupcake incident, the supervisor's suggestion that Anderson was too sensitive to gender issues—all relates to earlier incidents. In context, Anderson's allegations show a long-standing, unabated pattern of unwanted, sexually-oriented teasing, harassment, and ridicule that not only was condoned by her supervisors, but in which they personally took part. *See Sosa,* 920 F.2d at 1455-56. The various incidents, whenever they occurred, are neither isolated nor different in kind. *See Draper,* 147 F.3d at 1107.

Thus, we reverse the district court's finding that the incidents alleged in Anderson's complaint do not constitute a continuing violation. We reverse the entry of summary judgment as to Anderson's hostile work environment claim and direct the district court to admit these additional incidents as evidence at trial.

## II Disparate Treatment and Retaliation Claims

As to Anderson's disparate treatment and retaliation claims, we find that the existence of disputed material questions of fact precluded summary judgment.

 To withstand summary judgment on her disparate treatment claim, Anderson had to " 'produce very little evidence of discriminatory motive . . .' " *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998). Anderson's evidence was sufficient to rebut the alleged non-discriminatory motive advanced by Coulter for his alleged failure to support her gambling investigation. In addition to Anderson's account of Coulter's history of offensive behavior and comments, which, if true, afford some insight to his motivation, Anderson produced the declaration of As-

sistant U.S. Attorney Elizabeth De La Vega which stated, "I have observed a subtle pattern of behavior on SSA Coulter's part, both towards female agents and towards me, which is indicative of a discriminatory attitude towards women.... [H]e has consistently failed to give ... Anderson the support she needs to work on a complicated gambling and money laundering investigation." Also, contrary to the defendant's assertion that a Christmas holiday manpower shortage prevented them from assigning agents to help Anderson, she offered evidence that she had requested assistance as early as September. In our opinion, this was sufficient to raise a triable issue with regard to whether the defendant's non-discriminatory explanation is a pretext. *See Godwin,* 150 F.3d at 1220; *see also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889–90 (9th Cir. 1994).

 Anderson also stated a prima facie case of retaliation under Title VII. *See Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987) (stating elements of a prima facie case of retaliation under Title VII as (1) plaintiff engaged in a protected activity under Title VII; (2) employer took an adverse employment decision against plaintiff; and (3) a causal link between the protected activity and the employer's action). The conflicting deposition testimony of Fuentes and Coulter is sufficient to raise the question of whether Fuentes was truly impartial and had valid reasons to transfer Anderson in 1994— after she had started her EEO complaint against Coulter—or whether Fuentes, wittingly or otherwise, was carrying out Coulter's improperly motivated instructions. Fuentes testified that he asked Coulter whom he wanted transferred to the RDIS squad and discussed Coulter's selection of Anderson with him. Coulter denies this; he denies even knowing about the transfer until after it happened. Given Coulter's relationship with Anderson, Fuentes's testimony about having conferred with Coulter in advance of the transfer, and Coulter's denial, we conclude triable issues of fact exist concerning the motives underlying Anderson's transfer. *See Lam v. University of Hawai'i,* 40 F.3d 1551, 1560–62 (9th Cir.1994).

 With regard to the retaliation supposedly occurring in 1997, we disagree with the district court that Anderson had to separately exhaust her administrative remedies as to that claim in order to include it in the then-existing lawsuit. Although administrative exhaustion is generally a prerequisite to obtaining judicial review, we have recognized that forcing an employee to begin the administrative process anew after additional occurrences of discrimination in order to have them considered by the agency and the courts "would erect a needless procedural barrier." *See Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973); *see also Keith v. Volpe,* 858 F.2d 467, 473–74 (9th Cir.1988).

An examination of the 1997 retaliation claim shows that without question, it is part and parcel of the other claims that *had* been exhausted. Anderson contends that in 1997, her FBI supervisors retaliated against her for her previous EEO activities (which were then the subject of the instant lawsuit) by removing her from a joint operation with the DEA. The case agent in charge reportedly told her that she was reassigned because certain other agents did not want to work with someone who had filed EEO complaints.

It would be a different story if the 1997 claims raised a different theory of discrimination (e.g. racial discrimination) or were not directly related to the earlier claims. However, as alleged, the 1997 retaliation is a *direct continuation* of conduct that *had* been properly exhausted and specifically concerns it. Under these circumstances, we find no compelling reason to require yet another round of administrative activity and the filing of a separate lawsuit, when a lawsuit dealing with these directly related issues was already underway.

Accordingly, we reverse the district court's entry of summary judgment on the disparate treatment and retaliation claims.

**REVERSED AND REMANDED for trial on all claims.**