Susan MALUO, Plaintiff,

v.

Joji NAKANO; Nakano Co., Ltd., d.b.a. Hawaii Naniloa Resort; et al., Defendants.

No. Civ. 99–250 ACK.

United States District Court, D. Hawai'i.

July 18, 2000.

Stanford H. Masui, Takahashi Masui & Vasconcellos, Honolulu, HI, for Susan Maluo, plaintiff.

Paul M. Saito, Torkildson Katz Fonseca Jaffe & Moore, Honolulu, HI, for Joji Nakano, Nakano Company, Ltd., dba, Hawaii Naniloa Resort, defendant.

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, TO DISMISS

KAY, District Judge.

### BACKGROUND

On September 25, 1998, Susan Maluo ("Plaintiff") filed a civil suit ("the First Complaint") in the Circuit Court of Hawaii, Third Circuit, against her employer, Nakano Co., Ltd., d.b.a. Hawaii Naniloa Resort, and Joji Nakano (individually, "Nakano"), the owner of the hotel (collectively, "Defendants"). The action was removed to federal court by Defendants. Plaintiff claimed that she was the victim of both age and sex discrimination. On January 14, 2000, this Court granted Defendants' motion to dismiss certain claims in the First Complaint. The Court dismissed Plaintiff's state age discrimination, federal age discrimination, and federal sexual harassment claims with prejudice. The Court dismissed Plaintiff's state sexual harassment and constructive discharge claim, however, without prejudice. Plaintiff was granted thirty days leave to amend. *See* Order (filed Jan. 14, 2000).

On January 28, 2000, Plaintiff filed her First Amended Complaint ("the Amended Complaint"). She alleges therein that Defendants "created a hostile environment of sexual discrimination and harassment by acts and activities which were not welcome by Plaintiff Susan Maluo, which interfered with said Maluo's work performance and/or created an intimidating, hostile, and/or offensive work environment." Am. Compl. ¶ 7. Plaintiff enumerated three counts: 1) wrongful termination and sexual discrimination [1]; 2) intentional and/or negligent infliction of emotional distress; and 3) punitive damages. In the instant motion, Defendants seek to dismiss the complaint in full or have summary judgment granted in their favor.

Plaintiff [2] was hired by Defendants February 16, 1994 as the front office manager of the Hawaii Naniloa Resort in Hilo, Hawaii. Plaintiff complains about a variety of behavior by Nakano. For example, starting in March of 1996, Plaintiff was made to take on additional job responsibilities. She was expected to manage parts of the hotel previously managed by other persons, while still being responsible for the front office. No other managers were be-

---

1. Claim 1 is construed to assert claims for constructive discharge and sexual harassment.

2. All of these facts are taken from Plaintiff's opposition memorandum and separate and concise statement of facts. Defendants do not dispute these facts in either their motion or their reply brief, choosing instead to argue only the legal import of the facts. The Court therefore accepts as true for the purposes of this motion any of Plaintiff's allegations which are supported by her separate and concise statement of evidence.

ing given extra assignments at this time. Plaintiff did not receive extra pay for her extra work despite logging fourteen and sixteen hour days.

About May of 1996, Plaintiff was directed to hire an assistant. Nakano told her that he wanted Japanese women with "big boobs" hired by the hotel. To illustrate his desire to hire "endowed" employees, Nakano "cupped his hands at the chest level." *See* Tr.Pl.Dep. Mar. 16, 2000, attached as Ex. 1 to Pl. CSF, p. 19, 36–37 ("Pl.Dep."). Plaintiff hired an assistant named Ketura Obara (now DeMattos), a pretty half-Japanese girl. Plaintiff noticed immediately that Nakano looked at De-Mattos with "that look" and warned De-Mattos that, "I've seen the way Nakano looks at you and I seem to think that, you know, there is a challenge in his eyes." *Id.* at 21–22. She warned DeMattos not to wear short skirts or tight blouses. Nakano often invited DeMattos down to the bar while she was working. Nakano also spent an unusual amount of time talking with DeMattos and often in a back room. Usually he only spoke with managers, such as Plaintiff, and not an assistant, such as DeMattos.

Plaintiff complains of other things Nakano did to DeMattos, some of which she was present to observe, and other things which she only heard of after-the-fact. For example, she complains that she and DeMattos were called to the hotel bar one night in August of 1996 to have drinks with Nakano. Nakano directed DeMattos to sit next to him. *See* Pl.Dep. at 45. On another evening in August of 1996 at the hotel bar, Nakano asked DeMattos to dance to a slow dance. *See id.* at 46–47. It does not appear that Plaintiff was present this evening. DeMattos felt pressured to comply and felt "weird" about dancing with Nakano. *See* Tr. Dep. of Ketura DeMattos, attached as Ex. 3 to Pl. CSF, p. 44–45 ("DeMattos Dep."). Nakano admits to the dance. *See* Tr.Dep. of Joji Nakano, attached as Ex. 4 to Pl. CSF, p. 59–60 ("Nakano Dep.").

Plaintiff also complains about sexual discussions at company dinners. When Nakano was in town he would invite the managers to business dinners. These dinners often involved lots of drinking. Nakano and younger male managers would discuss sex in front of the female managers. These discussions would focus on how the male employees were mentally undressing female restaurant patrons, whether they "had any last night," and different sexual positions. *See* .Pl.Dep. at 61–63. Plaintiff thought this "really disgusting," but felt obliged to attend because Nakano was her boss. When Plaintiff would try to leave the dinners early, she was cajoled into staying longer. She felt it was "really degrading to have a boss do this." *Id.* at 24. Plaintiff did not feel that the men were targeting her by their discussions, but she did take offense to their behavior. *Id.* at 64. She also felt that there was nobody to complain to about the behavior because Nakano was the president of the company and a main participant in the behavior. *Id.* at 71–73. She believed that, although the joking and discussions probably violated the hotel's sexual harassment policy, complaining to her boss, Lei Andrade, was not worth doing because Andrade was present at the dinners. *See id.* at 71–74. It is not clear exactly when these dinners occurred, but they could not have occurred after late August of 1996. *See id.* at 59 (Plaintiff explaining that her last contact with Nakano before September 25 was at the end of August of 1996).

Additionally, Plaintiff complains about feeling unable to do her job properly because she could not criticize the problems she saw with the hotel's functioning because it would mean criticizing Nakano's mistress, Jane Rock ("Rock"). She claims that she tried to confront problems in the sales office (managed by Rock) at a July or August 1996 managers' meeting, but was "abruptly" stopped by Nakano who said that he didn't want to hear about it.[3] *See*

---

**3.** Plaintiff states that "I kind of went into [the

sales department's] face about some of the

*id.* at 40–42. Plaintiff believes Nakano was protecting the sales department because of his affair with Rock.

Nakano decided that he wanted to get rid of Plaintiff soon after this meeting. *See* Tr.Dep. of Leinani Andrade, attached as Ex. 2 to Pl. CSF, p. 51–52 ("Andrade Dep."). Andrade suggests that Nakano found Plaintiff outspoken and abrasive. She also suggests that Nakano was upset at Plaintiff's insinuation that Nakano was partial to the sales department. *See id.* at 60–61.

Plaintiff had no contact with Nakano between the end of August and September 25, 1996. *See* Pl.Dep. at 59. Plaintiff left for a two week vacation on September 7, 1996. Upon her return, she was called by Andrade and told not to come back to work that day. This struck Plaintiff as odd because there was a meeting that day which Plaintiff would have normally been required to attend as a manager. *See id.* at 51–52. This conversation took place September 23, 1996. *See id.* at 51–52, 68. Plaintiff accordingly took a couple of additional days off. *See id.* at 68. On the evening of September 25, 1996, Plaintiff was told by Andrade that she would be formally fired the next time she went to work. *See id.* at 68–70. She was not given a reason. Plaintiff also learned that while she was on vacation, DeMattos had been offered her job. *See id.* at 52. This was done despite Plaintiff being told, before going on vacation, that she was getting both a raise and a promotion. *See id.* Plaintiff was angry, upset, and distressed at this news. Plaintiff subsequently called her doctor and got a note from the doctor to take two weeks of sick time. *See id.* at 74. However, on the same day she saw her doctor, September 26, 1996, Plaintiff learned that the hotel had called her and asked her to come back to work. Andrade told her that she was not fired and that it had all been a "mistake." *See id.* at 74–75.

Plaintiff reported to work that day, September 26, 1996. After asking where De-Mattos was, Plaintiff learned that DeMattos had resigned as a result of Nakano's harassing behavior. *See id.* at 75–77. Plaintiff learned this information from other employees and DeMattos herself. Apparently, at a dinner on the night of September 25, 1996, Nakano asked DeMattos how old she was when she lost her virginity and rubbed his stockinged foot up and down her leg persistently. *See* DeMattos Dep. at 90–92. DeMattos quit on the spot. *See id.* Upon learning this information, Plaintiff realized the "mistake" in her firing: once DeMattos quit, the hotel had no front office manager and therefore, it needed Plaintiff back. *See* Pl. Dep. at 77–78. Nakano's conduct "really got to" Plaintiff. *See id.* at 84. She believed it was only a matter of time until she got fired for the second (and more permanent) time once the hotel had a replacement for her. *See id.* at 79. Moreover, Plaintiff believed that she could not work for someone like Nakano who hired young girls and used them for his own satisfaction. *See id.* at 79, 85. Knowing his behavior, Plaintiff would be afraid to hire any pretty girls to work at the hotel. *See id.* at 85.

Plaintiff felt compelled to, and did, quit her job. For approximately the next two years, Plaintiff saw doctors for her anxiety, depression, and irritability. She has been unable to work in the hotel industry again because of how much the events at the Hawaii Naniloa Resort troubled her. *See* Pl.Opp. Dismiss Ex 5, Pl. Affidavit ¶¶ 7–8.

Defendants moved to dismiss the Amended Complaint on February 17, 2000. Plaintiff filed an untimely opposition, and an accompanying separate and concise statement of facts, on April 28, 2000.[4] Defendants filed their reply memorandum on May 4, 2000. Based on the opposition filed

---

things that should not be happening." Pl. Dep. at 41.

4. Under Local Rule 7.4, "[a]n opposition to a motion set for hearing shall be served and filed not less than eighteen (18) days prior to the date of hearing."

by Plaintiff and the reply brief filed by Defendants, the Court has construed the motion before it to be a motion to dismiss, or in the alternative, for summary judgment.[5] The Court held a hearing on the instant motion on May 15, 2000.

## STANDARDS OF REVIEW

### A. Motion for Summary Judgment

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See State of Cal. v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.,* 809 F.2d at 630–31.

### B. Motion to Dismiss

Under Rule 12(b)(6), in determining whether a motion to dismiss for failure to

---

**5.** *See* Order (filed May 9, 2000) (stating that the motion to dismiss should be construed in the alternative as a motion for summary judgment based on Plaintiff's responsive filings).

state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles*, 797 F.2d 743, 745 (9th Cir. 1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Balistreri*, 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir.1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. *Id.*

A motion under Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the Complaint, such as lack of jurisdiction or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice*, ¶ 12.07 at 12–68 to 12–69 (2d ed.1991 & supp. 1991–92) (citing *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (emphasis added)).

## DISCUSSION

Defendants argue that summary judgment should be granted to them because Plaintiff cannot establish a prima facie case of either sexual harassment or constructive discharge. As to sexual harassment, Defendants claim that Plaintiff has not presented facts to establish that the offensive conduct was severe or pervasive. As to constructive discharge, Defendants maintain that Plaintiff cannot and has not presented facts to establish that a reasonable person would find the working conditions so intolerable as to quit. Defendants argue alternatively that the Amended Complaint should be dismissed because Plaintiff has not pled a cognizable claim for either sexual harassment or constructive discharge. They also argue that Plaintiff's emotional distress and punitive damages claims are derivative and cannot survive if the underlying claims are dismissed.

Plaintiff argues that summary judgment is improper because genuine issues of material fact exist. She argues that she has provided facts to make out every element of a sexual harassment claim. She also argues that a reasonable person in her position would have felt no alternative but to resign. Finally, she argues that Defendants' contention that her emotional distress claim is derivative is bogus because the claim is an independent tort.

### I. Sexual Harassment

 Hawaii Revised Statute § 378–2(1)(A) makes it an unlawful employment practice to discriminate against an individual on the basis of sex. H.R.S. § 378–2(1)(A). The Hawaii Administrative Rules make clear that the statute includes a prohibition on sexual harassment. *See* Haw.Admin. Rules § 12–46–109. Pursuant to the statute and the administrative rules, the Hawaii Supreme Court recently restated the requirements for a claim of hostile work environment sexual harassment. A plaintiff must show: "(1) that he or she was subjected to sexual advances, requests for sexual favors, or other verbal

or physical conduct of a sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct had the purpose or effect of either (a) unreasonably interfering with an individual's work performance or (b) creating an intimidating, hostile, or offensive work environment." *Steinberg v. Hoshijo*, 960 P.2d 1218, 1226, 88 Hawai'i 10, 18 (1998). A court making a determination of these elements should "look at the record as a whole and at the totality of the circumstances." *Id.* Recognizing that federal courts have considerable experience analyzing these types of cases, Hawaii courts often look to federal employment discrimination cases for guidance. *See, e.g., Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 13, 936 P.2d 643, 649 (Haw.1997). Thus, the Court notes that the Ninth Circuit has adopted similar elements for a hostile work environment claim for sexual harassment. *See Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (plaintiff must prove that "1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) the conduct was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' "). The issue under Title VII is whether the work environment was both objectively and subjectively offensive, that is, one that a reasonable person would find hostile or abusive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The perspective to be used in evaluating a hostile work environment claim is that of the victim. "Thus, if the complainant is a woman, the objective standard is met if a reasonable woman would consider such conduct sufficiently severe or pervasive to alter the conditions of employment and either unreasonably interfere with work performance or create an intimidating, hostile, or offensive work environment." *Steinberg*, 960 P.2d at 1226, 88 Hawai'i at 18. Relevant factors in performing this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

■ A sexual harassment plaintiff need not have been the direct object of harassing behavior, and may base his or her claim upon damages caused by the harassment of other employees. *See Leibovitz v. New York City Transit Authority*, 4 F.Supp.2d 144, 146, 150 (E.D.N.Y.1998) ("Personal harassment is not the gravamen of a hostile work environment claim.") (affirming jury award to plaintiff under Title VII who was never a direct target of harassing behavior but who was distressed by sexual harassment of female coworkers when much of the harassment did not occur in her immediate vicinity and much of what she knew was second- or third-hand); *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C.Cir.1985), *aff'd in part and remanded on other grounds*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."); *Seals v. Oil Data, Inc.*, 107 F.3d 21, 1997 WL 57133, at *2 (10th Cir.1997) (table decision) ("Incidents which support a hostile work environment claim need not directly involve the plaintiff.").

## A. Statute of Limitations and Continuing Violations

As a threshold matter, Defendants argue that the two year statute of limitations makes Plaintiff's allegations of misdeeds prior to September 25, 1996 irrelevant. Plaintiff argues, however, that she has alleged a continuing series of conduct that should be analyzed as a whole. In other words, Plaintiff alleges a "continuing violation."

A two-year statute of limitations governs employment discrimination claims in Hawaii. *See* H.R.S. § 657–7; *Linville v. Hawaii*, 874 F.Supp. 1095, 1104 (D.Haw.1994) (Kay, C.J.) (applying H.R.S. § 657–7 to

gender discrimination claim arising under H.R.S. § 378–2). A discrimination claim will not be sustained if it is based on an event or events that occurred more than two years before the filing of a charge. *See Linville,* 874 F.Supp. at 1104–05 (plaintiff's claims under H.R.S. § 378–2 time barred by H.R.S. § 657–7 because they were not filed until almost six years after her termination).

 The two year statute of limitations does not automatically bar Plaintiff from relying on events which occurred more than two years prior to the filing of her complaint, however. *Cf. Lesane v. Hawaiian Airlines,* 75 F.Supp.2d 1113, 1121 (D.Haw.1999) (Ezra, C.J.) (applying Hawaii law, allowing plaintiff to rely on events outside statute of limitations which were constant and closely related to the violations which occurred within the period of limitations for an intentional infliction of emotional distress claim). Under the continuing violation doctrine, acts of harassment occurring prior to the limitations period may be considered as part of the employment discrimination claim if those acts were part of a pattern of discrimination that continued into the limitations period. *See Anderson v. Reno,* 190 F.3d 930, 936 (9th Cir.1999); *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1480 (9th Cir.1989); *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982). A plaintiff must present "evidence of a series of related discriminatory acts." *Anderson,* 190 F.3d at 936. "A continuing violation may ... be established not only by demonstrating a company wide policy or practice, but also by demonstrating a series of related acts against a single individual." *Green,* 883 F.2d at 1480.

 To determine whether a serial violation has been established, the evidence must indicate that the alleged acts of discrimination are sufficiently related to constitute a continuing violation. *See Green,* 883 F.2d at 1480–81; *see also Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1108 (9th Cir.1998) (plaintiff presented suffi-cient evidence to raise a genuine factual issue whether the defendant's discriminatory conduct continued into the limitations period when she brought forth evidence of a series of closely related similar occurrences that took place within the same general time period and stemmed from the same general source). The Court considers "whether the alleged discriminatory acts (1) involve the same type of discrimination, (2) are recurring or isolated, and (3) 'have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights.'" *Erickson v. West,* 178 F.3d 1299, 1999 WL 310954 (9th Cir. May 7, 1999) (unpublished disposition) (quoting *Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 981 (5th Cir.1983)). If an earlier event had the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, then it is not substantially related to the later event, and therefore cannot form part of a continuing violation. *See Sabree v. United Bd. of Carpenters and Joiners, Local No. 33,* 921 F.2d 396, 402 (1st Cir.1990) (quoting *Berry,* 715 F.2d at 981).

*Anderson* involved the case of a female FBI agent who sued for sexual harassment in late 1994 and wanted the court to consider incidents of harassment from 1986 through early 1994. *Anderson,* 190 F.3d at 936. The district court excluded the evidence because it did not occur within the limitations period. *See id.* at 934. The district court then granted summary judgment for the FBI, finding that the remaining evidence would not cause a reasonable woman to find the plaintiff's work environment hostile. *See id.* The Ninth Circuit overturned the district court, finding that the events in the eight years preceding the limitations period showed a pattern of unwanted, sexually-oriented teasing, harassment, and ridicule that were neither isolated nor different in kind from the events which had occurred within the limitations period. *Id.* at 937.

 Plaintiff filed her complaint on September 25, 1998. The Court finds that

most of Plaintiff's evidence pre-dating the limitations period is "sufficiently related" so as to constitute a continuing violation. Plaintiff alleges that on September 25 she learned that she was being fired and replaced by DeMattos. She then alleges that on September 26, she was rehired, but upon hearing of yet another incident of harassment of DeMattos, quit. She alleges that she quit because she could not bear to be replaced again and also she did not want to work for Nakano while he harassed another young girl. The Court finds that these earlier incidents of Nakano's harassment of DeMattos are "sufficiently related" to the events within the period of limitations. Plaintiff asserts that her work environment was affected because of Nakano's harassment of DeMattos. As in *Anderson,* evidence of Nakano's earlier harassment of DeMattos is neither isolated nor different in kind from the events which occurred within the limitations period. Indeed, Plaintiff's evidence of Nakano's harassment of DeMattos during the summer of 1996 is the same type of discrimination that she learned of on September 26, 1996 that she says forced her to quit. Moreover, the earlier incidents involving DeMattos were not isolated, but clearly recurred into the limitations period. Finally, the Court finds that the treatment of DeMattos through the summer of 1996 did not have the degree of permanence that should have triggered Plaintiff's awareness that her rights were being violated. It was not until September 26, 1996 that Plaintiff realized the over-all seriousness of the situation. At that time, she realized that the treatment of DeMattos affected her because Nakano had attempted to replace her with DeMattos and, when he failed, Plaintiff feared she would have to watch the same situation unfold again with another pretty, young employee. In sum, the Court finds that Plaintiff's evidence about Nakano's harassment of DeMattos constitutes a pattern of discrimination that continued into the limitations period.

■ The Court reaches the same conclusion regarding Plaintiff's evidence that Nakano demanded that Plaintiff hire Japanese women with "big boobs" and the company dinners including sexual banter. These incidents are "sufficiently related" to incidents within the limitations period to be part of a continuing violation. The demand to hire "endowed" young women is directly related to Plaintiff's realization that her work environment was one where she would continually have to watch the boss fawn over sexually attractive young girls. The company dinners are related because they added to the uncomfortable, sexually charged environment at the hotel. It is not possible to consider these incidences as isolated from the events on or after September 25, 1996—they involve the same type of discrimination, namely, the fawning-over of sexier employees which hurt other employees by making their workplace sexually charged and uncomfortable. Accordingly, because the Court finds that these incidences are "sufficiently related" to the later incidences, they will be considered part of the continuing violation.

■ The Court reaches a different conclusion, however, as to Plaintiff's evidence about her increased work load in the spring of 1996 and Nakano's preferential treatment of Jane Rock. These pieces of evidence do not form part of a continuing violation. These acts have no relation to Nakano's harassment of DeMattos and the effect of that harassment on Plaintiff. They have no relation to Plaintiff's fear that her work environment had become one where she would have to observe Nakano harass young girls and even be the one to hire the girls. These allegations are therefore excluded.[6]

6. Even if the Court found that the evidence about Rock formed part of a continuing violation, it would not support Plaintiff's claim of sexual harassment. Because Rock was his mistress, Nakano presumably treated her preferentially to all other employees, not just Plaintiff. *See, e.g., Womack v. Runyon,* 147 F.3d 1298, 1299–1301 (11th Cir.1998) (when male boss promoted his female paramour, court found that male employee did not state

The Court finds that Plaintiff brought forth evidence of a continuing series of conduct which affected Plaintiff and her work environment. Plaintiff's claims may proceed using this evidence, even though much of it predates the limitations period. However, she may not rely on her other proffered evidence (increased work load and preferential treatment of Rock) because to the extent those actions raised claims, the statute of limitations has passed.

### B. Motion for Summary Judgment

 The Court finds that summary judgment at this stage is inappropriate. First, the Court finds that Plaintiff has come forth with evidence to satisfy her burden of meeting all three elements under *Steinberg.* Second, the Court finds that genuine issues of material fact exist as to whether or not Plaintiff was the victim of sexual harassment.

The first element of a hostile work environment sexual harassment claim is that the plaintiff be subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. *See Steinberg, supra.* Under *Leibovitz,* this element may be satisfied using evidence of the harassment of a female co-worker. Plaintiff presented the Court with evidence that over the five-month period from May until September 1996 she was told to make her hiring decisions based on whether female applicants were "endowed" with "big boobs" and that she was made to attend multiple company dinners where the president of the company and other male employees speculated what female restaurant patrons would look like nude, whether they "had any last night," and different sexual positions. Moreover, she had to watch and/or hear about Nakano fawning over DeMattos, including spending unusual amounts of time talking

to her, giving her "that look," making her sit next to him at the hotel bar, making her dance with him to slow music, asking her about losing her virginity, and rubbing his foot on her leg. The Court finds that a reasonable fact finder could conclude that Plaintiff's evidence of harassment, both direct and indirect, constitutes "other verbal or physical conduct of a sexual nature."

Second, Plaintiff came forward with evidence that this conduct was unwelcome. She produced evidence that she did not want to decide who to hire based on their chest size. She testified that she did not want to attend, and tried to leave early from, the company dinners where sex was always discussed. She also testified that she found the behavior at the dinners disgusting and degrading and that she talked about her feelings with Andrade, her boss. Furthermore, she brought forth evidence that she quit because she did not want to work for a man who harassed young girls and used them for his own satisfaction. Finally, she presented evidence that she tried to stop Nakano from harassing DeMattos by getting DeMattos to dress differently.

Third, Plaintiff has met her burden of producing evidence that Defendants' conduct either unreasonably interfered with her work performance or created an intimidating, hostile, or offensive work environment. As discussed, she found the company dinners disgusting and degrading. Plaintiff also testified that she was nervous about the way Nakano treated DeMattos. She presented evidence that his treatment of DeMattos interfered with her work because she was scared to hire other pretty women whom Nakano would use for his own satisfaction. Finally, she presented evidence that Defendants' conduct compelled her to quit her job because she did not want to work for someone that harassed female employees. The Court sim-

a claim under Title VII for sexual harassment because the preferential treatment was based on the consensual relationship between the supervisor and the employee; all other employees, regardless of gender, were at the same disadvantage as the plaintiff); *Keenan v.*

*Allan,* 889 F.Supp. 1320, 1374–75 & n. 65 (E.D.Wash.1995) (preferential treatment of co-worker who is romantically involved with supervisor does not constitute sexual harassment).

ply cannot say that this environment would not have unreasonably interfered with her work performance of a reasonable woman, nor that a reasonable woman would not have found that the environment was hostile or offensive.

The Court finds that Plaintiff has presented evidence on all elements she has the burden of proving at trial. Defendants have not attempted to disprove any of Plaintiff's allegations. Accordingly, there are material issues of fact which preclude an entry of summary judgment for Defendants. The Court also finds that the cases Defendants cited were unpersuasive and/or distinguishable from the instant case.[7] Summary judgment for Defendants is inappropriate and the motion is DENIED.

### C. Motion to Dismiss

██ Because the Court denied Defendants' motion for summary judgment, it must now turn to the alternative motion that Plaintiff's claim of sexual harassment be dismissed. The Court denies this motion as well. Plaintiff made sufficient allegations in her complaint to satisfy the test enumerated in *Steinberg* for sexual harassment.

First, Plaintiff's complaint alleged that Nakano harassed DeMattos. *See* Am. Compl. ¶ 7(d) & 10. Under *Leibovitz* and *Vinson*, this alone suffices as an allegation of "other verbal or physical conduct of a sexual nature." Moreover, she alleged that Nakano said he wanted to hire women with "large breasts, and demonstrated by holding his cupped hands at chest level." Am.Compl. ¶ 7(a). Plaintiff also averred that in meetings, Nakano discussed "sexual acts, including intercourse, women's breasts, and buttocks, in the presence of

[Plaintiff] and other women managers." Am.Compl. ¶ 7(b). Viewing these allegations in a light most favorable to Plaintiff, the Court finds that Plaintiff met her pleading burden sufficiently on the first prong of the *Steinberg* test.

The Court also finds that Plaintiff met her burden of pleading on the second and third prongs of the test. Plaintiff alleged that Defendants, "created a hostile environment of sexual discrimination and harassment by acts and activities which were not welcome by Plaintiff Susan Maluo, which interfered with said Maluo's work performance and/or created an intimidating, hostile, and/or offensive work environment." Am.Compl. ¶ 7. This paragraph clearly makes allegations sufficient to meet the second and third prongs of the *Steinberg* test. Accordingly, Plaintiff stated a claim upon which relief can be granted and dismissal is inappropriate. Defendants' motion to dismiss is DENIED.

### II. Constructive Discharge

██ A plaintiff pursuing a claim for constructive discharge must show that a reasonable person in her position would have felt that she was forced to quit because of intolerable and discriminatory working conditions. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994). One court in the Ninth Circuit summarized a constructive discharge claim as arising when "the individual has simply had enough; she can't take it anymore." *Draper*, 147 F.3d at 1110. Generally, "a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge." *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990). A plaintiff alleging a constructive discharge must show aggravating factors

7. To the extent Defendants are raising a defense to liability under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (creating a defense to vicarious liability when employer can prove a two-prong factual test), the Court rejects the defense at this time. Even if such a defense would be appropriate, Defendants do not sufficiently make it out in the instant filings. The defense requires factual

determinations, yet Defendants provide only arguments (but no evidence, as required on summary judgment) that they can meet the requirements. Furthermore, Plaintiff has asserted that she felt she had no one to complain to about Nakano's behavior because he was the boss, creating a genuine issue of material fact on whether or not the *Burlington Industries* defense applies.

or a continuous pattern of discriminatory treatment. *See id.*

### A. Statute of Limitations

 Defendants challenge Plaintiff's ability to bring her claims based on the statute of limitations. The Court finds that there is no statute of limitations problem with Plaintiff's constructive discharge claim. Because a constructive discharge claim is one form of employment discrimination claim, the Court applies the two year statute of limitations to Plaintiff's claim. *See, e.g., Linville*, 874 F.Supp. at 1104. The period of limitations begins to run on the date of the employee's resignation. *See Draper*, 147 F.3d at 1110–11 ("if the date of [the plaintiff's] quitting falls within the relevant period of limitations, as it unquestionably does here, her claim is timely filed."). Plaintiff quit her job on September 26, 1996. She filed suit September 25, 1998. Although close, the Court finds that she filed suit within the applicable limitations period.

Moreover, the same analysis that found a continuing violation for the purposes of Plaintiff's hostile work environment claim applies to her constructive discharge claim. Accordingly, when evaluating Plaintiff's constructive discharge claim, the Court will consider Plaintiff's evidence predating the limitations period on Nakano's demand to hire "endowed" women, the sexual discussions at company dinners, and Nakano's harassment of DeMattos.

### B. Motion for Summary Judgment

 The only issue is whether or not a reasonable woman in Plaintiff's situation would have felt forced to quit because of the allegedly discriminatory working conditions experienced by Plaintiff. The Court finds this issue inappropriate for determination on summary judgment.

The Court finds that Plaintiff has provided the Court with enough evidence to meet her burden at trial. Plaintiff presented evidence of sexual harassment of herself and others that affected her ability to do her job. She also brought forth evidence that she felt compelled to quit her job because to stay would mean watching Nakano harass other young women. Furthermore, she testified in her deposition that she would be afraid to hire any pretty girls to work at the hotel because of Nakano's behavior. Finally, she presented evidence that she felt compelled to quit because the way she was fired, and then rehired after DeMattos quit, made it obvious that she would be fired again as soon as Nakano had a pretty young replacement for her. Aggravating all of these facts were the indignity of being told her firing was a "mistake," the disgusting and degrading company dinners, and the order to hire women with "big boobs." Finally, Plaintiff presented evidence that she felt she had nowhere to turn to make a complaint about the behavior she was enduring.

There is obviously a genuine issue of material fact as to whether a reasonable person would have felt compelled to quit after going through Plaintiff's experiences. Defendants simply cannot show that reasonable minds could not differ on whether Plaintiff was constructively discharged. Defendants' motion for summary judgment is DENIED.

### C. Motion to Dismiss

Dismissal on this issue is also inappropriate. In this Court's Order of January 14, 2000, it stated:

> To plead constructive discharge, Plaintiff must allege that a reasonable person in her position would have felt that she was forced to quit because of intolerable and discriminatory working conditions. *See Steiner*, 25 F.3d at 1465. Plaintiff has made no such allegation.

Order at 15. Despite the Court's clear statement that a claim for constructive discharge must allege that the behavior would cause a reasonable person to quit, the Amended Complaint fails to make that allegation. However, in light of the fact that Plaintiff has presented evidence from which a reasonable fact finder could conclude that a reasonable person in her place would have felt forced to quit, it would be

a wasteful elevation of form over substance for the Court to dismiss her claim. Defendants are clearly on notice of her claim and she has shown that she could meet her burden at trial. Accordingly, Defendants' motion to dismiss Plaintiff's constructive discharge claim is DENIED.

### III. Intentional or Negligent Infliction of Emotional Distress

■ Plaintiff also claims that Defendants' actions constitute intentional or negligent infliction of emotional distress. Hawaii recognizes the torts of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED). *See generally Dunlea v. Dappen*, 924 P.2d 196, 206 & n. 11, 83 Hawai'i 28, 38 & n. 11 (1996).

Defendants argue that these claims should be dismissed because they are derivative to the sexual harassment and constructive discharge claims and, if those claims are dismissed (or, the Court presumes, decided in Defendants' favor on summary judgment) the IIED and NIED claims must fall as well. Because the Court did not dismiss (nor grant summary judgment on) Plaintiff's sexual harassment or constructive discharge claims, the Court does not reach this question. Defendants have not argued that Plaintiff failed to state a claim for IIED or NIED, nor have they moved for summary judgment on these issues.[8] Accordingly, the Court will not at this time evaluate whether these claims should be dismissed or if summary judgment should be granted.

### CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment, or in the alternative, to dismiss is DENIED.

IT IS SO ORDERED.

---

8. Defendants did not attack the merits of Plaintiff's IIED/NIED claim and therefore, the Court will not analyze the merits at this time, although the Court notes that Plaintiff faces a very high standard, especially on the IIED claim.