Abner J. MORGAN, Jr., Plaintiff–
Appellant,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, dba Amtṛak,
Defendant–Appellee.

No. 99–15374.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 2000

Filed Nov. 8, 2000

---

Pamela Y. Price, Curtis E. Allen, Price And Associates, Oakland, California, for the plaintiff-appellant.

Kay M. Long–Martin and Theodora R. Lee, Littler Mendelson, Oakland, California, for the defendant-appellee.

Before: LAY,[1] D.W. NELSON and THOMAS, Circuit Judges.

LAY, Circuit Judge:

Abner J. Morgan, Jr. (Morgan) filed suit against National Railroad Passenger Corporation (Amtrak), alleging violations of Title VII of the Civil Rights Act of 1964, as amended in 1991. *See* 42 U.S.C. § 2000e *et seq.* (Title VII). Morgan claims that, because of his race, he suffered discrimination and retaliation, and endured a hostile work environment. The district court granted partial summary judgment in favor of Amtrak, holding that Amtrak could not be liable for conduct occurring prior to May 3, 1994. A trial was held on the remaining allegations, and the jury returned a verdict in favor of Amtrak. Morgan now appeals both the ruling on summary judgment and the judgment rendered on the jury verdict.

With regard to the grant of partial summary judgment, Morgan argues the district court erred in limiting the liability time frame. As to the judgment on the jury verdict, Morgan asserts the district court erred in four ways: 1) instructing the jury that evidence of pre-limitations period conduct was for "background" or "context" only; 2) excluding certain testimony by Morgan and co-workers regarding the racially hostile environment;[2] 3) improperly instructing the jury on the hostile environment claim; and 4) imposing improper time limits on the presentation of Morgan's case.[3] We find the district court erred in entering judgment as a matter of law. Thus, we reverse and remand for a new trial.

## I. BACKGROUND

### A) *Factual Background*

Morgan, an African–American male, alleges that from the beginning of his employment with Amtrak, and throughout his tenure, he was subjected to discriminatory and retaliatory acts and endured a racially hostile work environment. He alleges that the managers at the Oakland Maintenance

---

1. The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

2. The district court excluded portions of testimony by Morgan and Mary Fontaine, and it excluded all of Joe George's testimony.

3. At trial, Morgan's first witness was to be Joe George; however, as noted *supra,* the district court excluded his testimony in its entirety. Morgan's attorney requested a continuance to prepare Morgan, who was to be the next witness. The court indicated that if a continuance was granted, time would be deducted from the overall time allotted for the case. Morgan took the stand immediately.

Yard (the Yard), specifically, Robert Vandenburg, Ray Borge, Jerry Denton, Earl Geske, and Mike Bordenave, primarily perpetrated the acts. As we must, we construe the facts in the light most favorable to Morgan.

### 1) Incidents Prior To the Limitations Period

Morgan applied for a job with Amtrak in 1990. Although trained and experienced in electrical work, Morgan began working in August 1990 as an "Electrician Helper." Morgan asserts he believed he was being hired as an electrician, from the beginning he performed the work of an electrician, and that less qualified Caucasians were hired as electricians. Morgan is the only person ever hired as a "helper" at the Yard. Eventually, Morgan's position was reclassified and his pay brought in line with that of electricians in April 1992.

In February 1991, Vandenburg and Denton instructed Morgan to attend a meeting in Vandenburg's office. Fearing the meeting might lead to disciplinary action because he had recently called in sick, Morgan refused to attend without union representation.[4] Vandenburg and Denton then charged Morgan with a Rule L violation for refusing to follow orders and attend the meeting.[5] Following a hearing, Morgan was terminated for this violation. Morgan filed a grievance and, in response, Amtrak reinstated him, reducing the termination to a suspension and paying him for all but ten days. Amtrak's Inspector General testified at trial that this ten-day suspension was the most severe discipline imposed on an employee from 1989–1992.

In August of 1991, Morgan made a written request to Amtrak's Los Angeles personnel office asking to participate in Amtrak's apprenticeship program. Within days of filing such request, Vandenburg told Morgan he stood "a snowball's chance in hell of becoming an electrician" at his yard. He never received a written response from Amtrak's Los Angeles office.[6]

In early October 1991, Morgan sent a letter complaining of race discrimination to Amtrak's Equal Employment Office (EEO) and copied it to his congressperson. Morgan never received a formal response to this complaint from Amtrak. On October 16, 1991, Denton gave Morgan a written counseling for violating Rule L because he ignored a direct order to desist while helping an escorting officer pack a co-worker's belongings. Morgan immediately protested this counseling, alleging that it was racially motivated.

In the fall of 1991, Morgan and other employees met with their congresswoman to complain about conditions at the Yard. Shortly after this meeting, on December 13, 1991, Vandenburg placed a letter of counseling in Morgan's file, accusing him of being argumentative and threatening. Early in 1992, the congresswoman contacted Amtrak regarding the employee complaints. In response, Amtrak's Inspector General conducted an investigation of the Yard. Amtrak insists that a list of primary concerns was then drafted and improvements made. At trial, however, Amtrak's EEO representative responsible for the Yard during the relevant time period denied knowledge of the investigation.

On September 17, 1992, Vandenburg and Borge counseled Morgan for alleged absenteeism. Morgan contends that the charged absenteeism included several months of previously approved leave, which had been granted so that he could care for his son.

---

4. Under the collective bargaining agreement in place at the time, Amtrak employees had a right to union representation at meetings which might lead to disciplinary action.

5. Rule L prohibits insubordination and provides in relevant part, "[e]mployees must obey instructions, directions and orders from Amtrak supervisor personnel and officers, except when confronted by a clear and immediate danger to themselves, property or the public. Insubordinate conduct will not be tolerated."

6. Amtrak insists that Morgan was scheduled to go through the program the following year but the program was discontinued prior to his admission.

On September 19, 1992, Mike Fabian, an Amtrak foreman, ordered Morgan to clean up tar on one of the tracks. This work was outside of Morgan's job description. Then, on November 29, 1992, Morgan was again assigned a task outside his craft, specifically, Geske assigned him the task of picking up tie wraps.[7] Morgan asserts that he picked up as many tie wraps as possible during his shift, but he could not possibly pick up all of them. Regardless, on December 1, 1992, Geske gave Morgan a written counseling for a Rule L violation for failing to pick up all of the tie wraps.

In April 1993, Morgan received another written counseling from Denton for absenteeism. This counseling targeted Morgan's tardiness and attendance on three days—including one excused absence. This counseling occurred despite a recommendation from Amtrak's Inspector General that management should not be strict with regard to minor absenteeism.

In May 1993, Morgan requested, first verbally and then in writing, a one-day leave of absence, in addition to the eight days of vacation for which he was scheduled. Vandenburg denied the requests. Morgan did not appear at work on the day in question. As a result, Morgan was charged with a Rule L violation and suspended for fifteen days. Morgan filed a letter of complaint with Amtrak's EEO office and his union. Eventually, Morgan received back pay and the suspension was ordered expunged from his file.

On May 25, 1993, Morgan asked Vandenburg, in writing, why his name was removed from the list of employees scheduled to be trained on heating, air, and ventilation systems. On that same day Morgan filed a written complaint with Amtrak's EEO office alleging ongoing racial discrimination and retaliation. Then on May 30, 1993, Morgan filed another written complaint with Amtrak's EEO office.

In September 1993, Vandenburg received a letter requesting an investigation of an alleged conversation during which Morgan made improper comments to a union representative. A preliminary investigation confirmed that a conversation had occurred.[8] Morgan, however, would not discuss the incident with Vandenburg and instead asked for a formal investigation. In October 1993, Morgan was charged with violating Rules F–1 and F–3.[9] After an investigatory hearing, the charges against Morgan were dropped and the incident ordered expunged from his record.

During a training session in October 1993, Vandenburg physically touched Morgan. The contact consisted of Vandenburg approaching from behind, placing his hands on Morgan's shoulders, pushing down, and whispering in his ear. Interpreting the contact as an assault, Morgan reported the incident to the Southern Pacific police, the Oakland police, and filed a written complaint with Amtrak's EEO office. Morgan asserts that Amtrak did not investigate or respond to the situation.

7. Amtrak asserts everyone was assisting in a general cleanup in preparation for an audit; however, no other employee testified to having to perform these specific tasks on the same occasion.

8. The conversation between Morgan and the union representative was overheard by another employee. Apparently, this employee's recollection initially supported the union representative's position but later changed to corroborate Morgan's version. At trial the employee testified that a number of supervisors pressured him to change his statement to support the union representative. Specifically, he testified that Vandenburg stated, "Ab-

ner was a problem employee, and that they were going to fire him anyways [sic]."

9. Rule F governs employee conduct. Rule F–1 states: "All employees are required to conduct themselves in a courteous and professional manner in dealing with the public and other Amtrak employees. Boisterous conduct or horseplay and profane or vulgar language are prohibited." Rule F–3 states: "Conduct involving dishonesty, immorality, or indecency is prohibited. Employees must conduct themselves on and off the job so as not to subject Amtrak to criticism and loss of goodwill."

In December 1993, Morgan's scheduled training was cancelled. In January 1994, Morgan wrote a letter to Amtrak's EEO complaining of such cancellation. Morgan asserts that Amtrak never formally responded.

In January 1994, Morgan called in sick to work for one day. When he returned, Borge and other supervisors required him to produce a doctor's note before he could return to work. Despite the fact a note was not required under Amtrak's sick leave policy, when he could not produce a note Morgan lost three days of pay. After filing a grievance, Amtrak paid Morgan for the lost days, excluding the one sick day.

### 2) Incidents Within the Limitations Period

On September 2, 1994, Morgan was assigned to work on multiple trains. At the end of his shift Morgan had completed work on only one of the trains. Morgan's immediate supervisor spoke with him about not finishing the work and he was subsequently charged with a Rule L violation for failing to complete work assigned to him. Morgan argues that turning over unfinished work to the next shift was not uncommon. There was an investigatory hearing and Morgan was suspended for fifteen days.[10]

In October 1994, Morgan was again denied training and complained to Amtrak's EEO office regarding the cancellation of such training. He received no response.

In December 1994, Morgan was accused of threatening Bordenave during a meeting. Despite investigation, the allegation was unsubstantiated and no action was taken against Morgan.

On February 4, 1995, Bordenave reported to Denton that Morgan had threatened

him. Morgan paints a different picture. He asserts that Bordenave falsely claimed he had been threatened and that when ordered into Denton's office, he asked for union representation or the presence of a co-worker as a witness. Denton denied both, ordered everyone out of the office, and yelled at Morgan to get his "black ass" into the office. Morgan refused and went home. As a result of the incidents, Morgan was suspended and charged with violations of Rules L and F. An investigatory hearing was held and on March 3, 1995, Morgan was terminated.

### 3) Overall Environment

Morgan presented evidence from a number of fellow Amtrak employees regarding the racially-laden atmosphere at the Yard. Specifically: 1) Art Conley, a former manager, testified that Borge made racial jokes, used the "n" word, performed racially derogatory acts in front of Vandenburg, and that Vandenburg made negative comments regarding African–Americans' capacity to be supervisors; 2) two African–American Amtrak supervisors testified to Borge's racially offensive conduct; 3) two African–American co-workers testified Denton made racially derogatory comments; 4) a number of other witnesses testified to hearing Denton and Bordenave use racial epithets; 5) Joe George, a former employee, was to testify Vandenburg made racially derogatory comments and referred to him as "boy," and that Geske made racially derogatory statements, including that he would kill his daughter before he would allow her to date a black man;[11] and 6) Mary Fontaine, a former employee, testified to the demeaning manner in which Denton treated African–Americans and to racial slurs she heard.[12]

---

10. This suspension was affirmed on appeal to the National Railroad Adjustment Board.

11. As noted *supra*, the district court entirely excluded George's testimony because Morgan had not properly submitted an offer of proof in the pre-trial report and because such testimony was cumulative and more prejudicial than probative.

12. At trial, the district court excluded two other pieces of Fontaine's testimony. First, the district court excluded testimony of her knowledge of Denton's comment regarding working "niggers to death" because such testimony was hearsay and was more prejudicial than probative. Second, the district court excluded her testimony regarding disparate

B) *Procedural Background*

On February 27, 1995, after his suspension but prior to his termination, Morgan filed a charge of discrimination and retaliation against Amtrak with the Equal Employment Opportunity Commission (EEOC) and cross-filed with the California Department of Fair Employment and Housing. On July 3, 1996, the EEOC issued a "Notice of Right to Sue" and Morgan filed the instant lawsuit on October 2, 1996. Amtrak filed a Motion for Summary Judgment, arguing in part that it was entitled to judgment on all incidents that occurred more than 300 days before the filing of Morgan's EEOC charge.[13]

On September 11, 1998, the district court granted in part Amtrak's Motion for Summary Judgment, holding that Amtrak could not be liable for conduct that occurred prior to May 3, 1994, because such conduct was outside the applicable 300–day limitations period. The district court went on to find that Morgan had raised a genuine issue of material fact sufficient to proceed to trial on a number of his timely filed claims. A trial proceeded on the remaining allegations,[14] and the jury returned a verdict in Amtrak's favor on November 19, 1998. This appeal ensued.

## II. DISCUSSION

█ This court reviews a district court's grant or denial of a motion for summary judgment *de novo. See Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). The question of whether the pre–1994 claims are time barred is a question of law reviewed *de novo. See Bouman v. Block,* 940 F.2d 1211, 1218–19 (9th Cir.1991). In reviewing an order denying or granting summary judgment, we must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *See Robi,* 173 F.3d at 739.

Morgan argues that the conduct delineated above, including those incidents dating back to the beginning of his employment, constitutes a violation of his Title VII rights. The district court granted partial summary judgment, holding that all claims arising from occurrences prior to May 1994 were time barred.

### A. *Continuing Violation Theory*

█ As noted *supra,* before a suit may be filed under Title VII, a plaintiff must file a complaint with the EEOC within 180 or 300 days. *See* 42 U.S.C. § 2000e–5(e)(1). Title VII's limitation period limits liability to conduct occurring within the applicable limitations period; the continuing violations doctrine, however, allows courts to consider conduct that would ordinarily be time barred "as long as the untimely incidents represent an ongoing unlawful employment practice." *Anderson v. Reno,* 190 F.3d 930, 936 (9th Cir.1999); *see e.g., Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1107 (9th Cir.1998). In limiting the time frame to events taking place after May 3, the district court relied on *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164 (7th Cir.1996). In *Galloway,* the Seventh Circuit held the continuing violations doctrine does not apply "unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct." *Id.* at 1167. Relying on *Galloway,* the district

---

discipline based on race because it was beyond the scope of the case.

**13.** Title VII actions cannot proceed in federal court unless a charge of discrimination is first filed with the EEOC. Generally, a complaint must be filed within 180 days of the alleged unlawful employment practice. If a plaintiff initially institutes proceedings with an appropriate state agency, however, the deadline is extended to 300 days. *See* 42 U.S.C.

§ 2000e–5(e)(1). The parties in this case agree that the applicable limitations period is 300 days.

**14.** Specifically, the district court found Morgan had raised a genuine issue of material fact regarding his September 1994 suspension, the October 1994 cancellation of training, his February 1995 suspension, and his termination.

court concluded that "[b]ecause Morgan believed that he was being discriminated against at the time that all of these acts occurred, it would not be unreasonable to expect that Morgan should have filed an EEOC charge on these acts before the limitations period on these claims ran."

The district court's reliance on *Galloway* was mistaken. This court has never adopted a strict notice requirement as the litmus test for application of the continuing violation doctrine; in fact, in *Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir.2000), we explicitly rejected such an approach from the Fifth Circuit. *See id.* at 987 n. 10. *Fielder* examined *Berry v. Board of Sup'rs of L.S.U.*, 715 F.2d 971 (5th Cir. 1983), a case which involved equal pay based upon gender discrimination, where the Fifth Circuit created a multi-factor test for determining whether discrete acts of harassment are closely related enough to satisfy the continuing violation theory. The *Berry* court's final factor, "perhaps of most importance," asked whether the harassing act "should trigger an employee's awareness of and duty to assert his or her rights." *Berry*, 715 F.2d at 981. We rejected the *Berry* analysis, holding that test was not "applicable in determining the continuation of a hostile environment." *Fielder*, 218 F.3d at 987 n. 10.

Indeed, this court's decision in *Fielder*, as well as *Anderson* and *Draper*, precludes such a notice limitation on the continuing violation doctrine. In *Fielder*, for example, plaintiff filed suit in mid–1995, after being subject to a pattern of harassing behavior stretching back to 1991. *See Fielder*, 218 F.3d at 977, 983. Even though the harassing behavior was such that a reasonable person would have been on notice that her rights were violated,[15] we held that the continuing violation doctrine applied. *See id.* at 988. Likewise, in *Draper*, plaintiff began employment in November of 1992, and began suffering harassment shortly thereafter. *See Drap-*

*er*, 147 F.3d at 1105. Even though she brought her harassment claim in mid–1995, we held:

> [b]ecause [plaintiff's] hostile work environment claim is not based upon a series of discrete and unrelated discriminatory actions, but is instead premised upon a series of closely related similar occurrences that took place within the same general time period and stemmed from the same source, her allegations set forth a claim of a continuing violation.

*Id.* at 1108. Finally, *Anderson* involved a similar situation. In *Anderson*, we applied the continuing violation doctrine where plaintiff filed suit in 1994 after experiencing harassment stretching back to 1986. *See Anderson*, 190 F.3d at 936–37. Based on this circuit's decisions in *Fielder*, *Anderson*, and *Draper*, this court rejects the rigid test of both *Galloway* and *Berry*.

■ According to *Fielder*, a plaintiff can establish a continuing violation in one of two ways. First, by showing a series of related acts one or more of which are within the limitations period—a serial violation. A serial violation is established if the evidence indicates that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period. *See id.* *See also Green*, 883 F.2d at 1480–81. Precedent makes clear that the alleged incidents of discrimination cannot be isolated, sporadic, or discrete, *see Draper*, 147 F.3d at 1107–10. In *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990), this court found a sufficient relationship where the acts were "*plausibly related* as acts of discrimination against Sosa because of his identification as a Mexican–American." (emphasis added).

The second way to establish a continuing violation is to show a systematic policy or practice of discrimination that operated, in part, within the limitations period—a sys-

---

**15.** For example, plaintiff in *Fielder* told her harasser in 1991 to "stop touching her and that if he continued, she would obtain legal counsel and pursue a claim against him."

*See Fielder*, 218 F.3d at 977. Further, she obtained counsel in 1993 to deal with the hostile work environment.

temic violation. *See id.* Systemic violations involve "demonstrating a company wide policy or practice" and most often occur in matters of placement or promotion. *Green,* 883 F.2d at 1480.

### B. *Application of Continuing Violation to Morgan's Title VII Claims*

To survive summary judgment after failing to satisfy the limitations period requirement, Morgan must raise a genuine issue of disputed fact as to 1) the existence of a continuing violation—be it serial or systemic, and 2) that the violation continued into the limitations period. *See Fielder,* 218 F.3d at 983. In applying the first prong, the *Fielder* court noted, "[s]o long as the conduct has the capacity of being considered [a violation], it becomes an issue for the fact finder." *Id.* at 986. With regard to the second prong, this court looks to see whether the acts during the period "involve the same type of discrimination as those committed before the period. We must inquire whether there is a common type of discrimination, such as [racial] harassment, or if there is a common kind of employment action, such as repeated denial of a promotion." *Id.*

Morgan alleges three distinct Title VII claims, each which have different legal elements; consequently, "[w]e consider the allegations with respect to each theory separately, in determining whether any of the events underlying these claims occurred within the relevant period of limitations." *Draper,* 147 F.3d at 1108. Thus, we analyze Morgan's claims of discrimination, hostile environment, and retaliation discretely.[16] In light of the totality of the circumstances, we are satisfied that the pre-limitations conduct at issue in this case is sufficiently related to the post-limitations conduct to invoke the continuing violation doctrine. We hold that the district court erred in granting a partial summary judgment holding that Amtrak could not be liable for conduct occurring prior to May 3, 1994.

**16.** We note, however, that the evidence of each alleged violation significantly overlaps,

### i) Discrimination

 To prove racial discrimination, Morgan must show that he 1) belonged to a class protected by Title VII, 2) was qualified for the position in question, and 3) suffered an adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The alleged pre-limitations discriminatory conduct which Morgan points to includes: 1) numerous questionable disciplines and counselings (the February 1991 Rule L violation and termination which was eventually reduced to a suspension, the September 1992 counseling for absenteeism, the December 1992 counseling for his failure to pick up tie wraps, the April 1993 counseling for absenteeism, the July 1993 suspension which was later ordered expunged, the October 1993 rule violation, of which Morgan was eventually found not guilty, and the January 1994 improper withholding of pay for failure to produce a doctor's note), and 2) numerous instances in which Amtrak denied him career opportunities (his 1990 hiring as an electrician helper, the 1991 application to Amtrak's apprenticeship program, the May 1993 removal of Morgan's name from training, and the December 1993 cancellation of training). We find that these incidents, taken together with the abundant evidence from other employees and management regarding the racially discriminatory atmosphere at the Yard are "sufficiently related" to the alleged incidents of discrimination that occurred within the limitations period. These incidents reveal a consistent pattern of similar employment actions (e.g., discipline and denial of professional training) over the entire five-year period of employment, perpetrated by the same core group of managers. Such incidents are not discrete or isolated. We are satisfied that the pre-limitations period is closely enough related to the acts occurring during the limitations period to trigger the operation of a continuing violation

and segregating them is both a difficult and artificial task.

theory on Morgan's claim of racial discrimination.

#### ii) Hostile Environment

■ "A 'hostile work environment' occurs when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper*, 147 F.3d at 1108 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). As this court noted in *Fielder*, "[m]ost instances of hostile environments are not capable of facile identification. '[I]nstead, the day-to-day harassment [is] particularly significant, both as a legal and a practical matter, in its cumulative effect.'" *Fielder*, 218 F.3d at 985 (quoting *Draper*, 147 F.3d at 1108).

■ Evidence of the Yard's pre-limitations period hostile environment includes the decision to hire Morgan at a lower grade than others, Morgan's multiple disciplines and denial of training, the use of racially derogatory language, and the overall racially-laden environment. We note that the jury, when commenting on the verdict, stated that it had found "evidence of a hostile work environment at the Oakland Yard during May 1994 and February, 1995" but found there was insufficient evidence to establish it was severe and pervasive. This court finds the pre- and post-limitations period incidents involve the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers. In light of this, we find sufficient evidence to employ the continuing violation doctrine and allow the jury to consider the whole of Morgan's tenure for purposes of liability on his hostile environment claim.

#### iii) Retaliation

■ To establish a prima facie case for retaliation, plaintiff must show: 1) he has engaged in a protected activity; 2) he has suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987). Morgan presented evidence of his numerous complaints to Amtrak's EEO office, as well as the complaints he made to external authorities, regarding the racially hostile environment in the Yard. Further, the evidence reveals that while Morgan often did not receive an official response, an allegedly unrelated discipline was inevitably leveled against him within a short period. Specifically, on October 4, 1991, Morgan filed a complaint with Amtrak's EEO office and on October 16, he received a written counseling for a Rule L violation; in the fall of 1991, Morgan and others met with their congresswoman and discussed concerns about discrimination and in December 1991, a letter of counseling was placed in Morgan's file; in May 1993, he filed a race discrimination complaint with Amtrak's EEO office and within days Morgan asserts that his shift was changed.

■ As was noted above, the same players were involved in each of these incidents, and the incidents demonstrate a regular pattern of potentially retaliatory conduct throughout Morgan's tenure. We find that the pre-limitations conduct is sufficiently related to the conduct within the limitations period and, thus, hold the continuing violation doctrine works to allow a jury to find liability on Morgan's retaliation claim.

### III. CONCLUSION

When the pre-limitations events in this case are viewed in the context of the totality of Morgan's relationship with Amtrak, it is apparent that they are part of a series or pattern of discrimination, retaliation, and hostile environment that started nearly contemporaneously with Morgan's employment and continued throughout his tenure. In light of the relatedness of the incidents, we find that Morgan has sufficiently presented a genuine issue of disputed fact as to whether a continuing violation existed. Thus, we hold that pre-limitations period conduct should have been presented to the jury not merely as

background information, but also for purposes liability. Accordingly, we reverse and remand for a new trial.

 In light of our ruling, we need not specifically rule on the evidentiary issues raised by Morgan; however, because these issues may arise again on retrial, we voice a general comment. We note that one of the main issues in a hostile environment or discrimination case is the pervasiveness of the conduct at issue. In this case, the district court excluded significant pieces of information regarding such environment, specifically, portions of Morgan and Fontaine's testimony and the whole of George's testimony. This evidence went to the overall environment of the Yard. This court has previously recognized that an employer's conduct tending to demonstrate its general hostility towards a group is both relevant and admissible. *See Heyne v. Caruso,* 69 F.3d 1475, 1479 (9th Cir.1995). *See also Spulak v. K Mart Corp.,* 894 F.2d 1150, 1156 (10th Cir.1990) (noting that "[a]s a general rule, the testimony of other employees about their treatment by the defendant [employer] is relevant to the issue of the employer's discriminatory intent.") We further note that, in returning the verdict, the jury expressed concern about the overall environment at the Yard. The jury commented:

> We find the management at the Oakland Yard during the time of Mr. Morgan's employment to have engaged in grossly unprofessional & questionable ethical conduct. Most especially, the EEO office of Amtrak was woefully remiss in following up & supervising its recommendation for procedural changes at the Oakland facility, and their general sincerity questionable.

The testimony of Morgan and his co-workers goes to the pervasiveness of the conduct at issue. On retrial, we encourage the district court, when ruling on admissibility of evidence, to consider all evidence in light of its relevance to whether the defendant's conduct may be considered severe and pervasive.

We vacate the grant of partial summary judgment, as well the judgment on the verdict, and we grant a new trial on the overall issues of discrimination, hostile environment, and retaliation.

REVERSED AND REMANDED.