**Dossey DOUGLAS, Plaintiff–Appellant,**

v.

**CALIFORNIA DEPARTMENT OF YOUTH AUTHORITY, Defendant–Appellee.**

**No. 99–17140.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 2001

Filed Nov. 14, 2001

David C. Anton, Davis, California, attorney for the plaintiff-appellant.

Teresa Michelle Laird, Deputy Attorney General, Oakland, California, attorney for the defendant-appellee.

Before: PREGERSON, FERGUSON, and HAWKINS, Circuit Judges.

PREGERSON, Circuit Judge:

Dossey Douglas ("Douglas") was denied employment by the California Youth Authority ("CYA") because a vision test indicated that he was color-blind. Douglas brought suit against CYA for its failure to hire him under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794. The district court granted summary judgment to CYA on the ground that Douglas's claims are barred by the applicable statutes of limitations. Douglas argues on appeal that his claims are timely under the continuing violations doctrine because the CYA's discriminatory policy was on-going. Alternatively, Douglas argues that his failure to comply with the statutes of limitations should be excused under the doctrines of equitable tolling or equitable estoppel. On appeal, CYA argues for the first time that the Eleventh Amendment is a defense to both claims.

With respect to Douglas's ADA claim, we remand the claim to the district court to determine whether CYA waived its sovereign immunity defense in this case. With respect to Douglas's Section 504 claim, we conclude that California waived its sovereign immunity defense by accepting federal Rehabilitation Act funds. Because we determine that Douglas's claims are timely under the continuing violations doctrine, we do not reach Douglas's equitable tolling or estoppel arguments.

## I.

Douglas, an African–American, first applied for a position as a Group Supervisor with the defendant, CYA, in 1994. Douglas served as an air traffic controller in the United States Navy at the Alameda Naval Air Station. As an air traffic controller, Douglas interpreted colored lights on panels, screens, and related instruments, despite his color vision deficiency. Douglas was honorably discharged from the Navy after twelve years of service. He moved from the Bay Area to Sacramento and began looking for work in the Sacramento area.

In the fall of 1994, Douglas learned that CYA was accepting applications for the position of Group Supervisor, a job that

entails supervising youthful offenders in CYA facilities. The screening process for applicants involves a written examination, oral interviews, a background check, and a physical examination. CYA administers the written examination in the fall of every other year and keeps the applications on file between examination periods.

Douglas took and passed the written examination for the position in November 1994. Over the following year and a half, Douglas passed the other screening tests. In March of 1995, CYA notified Douglas that he was ranked fourth on the eligibility list for hiring. Three months later, CYA adopted for the first time a color vision standard for the position of Group Supervisor. CYA notified Douglas of the new color vision standard by letter on June 1, 1995. On January 18, 1996, CYA offered Douglas a position at its DeWitt Facility, conditioned on his passing additional medical tests, including a vision test.

One week later, CYA tested Douglas's vision. CYA notified Douglas on February 1, 1996 that he had failed the color vision test. CYA informed Douglas that he could pay for an additional vision test at his own expense (a "Farnsworth D–15" test), and that if he passed the second test he would be hired. Douglas sought a private doctor, Dr. Shinfuku, who administered the Farnsworth D–15 test to Douglas on February 5, 1996. Dr. Shinfuku determined that Douglas had a "moderate" color vision deficiency. The Chief Medical Officer of CYA reviewed Dr. Shinfuku's results and concluded that Douglas failed the Farnsworth D–15 test. CYA notified Douglas on March 1, 1996 that he failed the vision test, and that he could appeal to the State Personnel Board within thirty days.

At Douglas's request, Dr. Shinfuku reviewed the CYA job posting, which specified that persons with mild to moderate color vision deficiencies would be eligible for the Group Supervisor position. Dr. Shinfuku wrote a letter to CYA stating that Douglas was qualified under this standard. A second doctor tested Douglas and also concluded that Douglas had a "moderate" color vision deficiency.

On March 24, 1996, Douglas went to the CYA "Equal Opportunity Office" ("EEO") and met with an Equal Opportunity Technician. In response to Douglas's question about available avenues for appeal, the officer explained to Douglas that he could file a complaint with the EEO, and appeal to the California State Personnel Board. The officer did not instruct Douglas to file an appeal with the federal Equal Employment Opportunity Commission ("EEOC")—or explain that the EEO was different from the EEOC.

In late March of 1996, Douglas submitted a complaint to the EEO office and appealed CYA's decision to the State Personnel Board. On May 2, 1996, Douglas's discrimination charge filed with the EEO office was denied. While awaiting the results of the State Personnel Board's decision, Douglas re-tested for the position of Group Supervisor in the fall of 1996. The State Personnel Board notified Douglas on February 27, 1997 that his appeal was denied and informed him for the first time of his right to file an action in state or federal court, or to file a discrimination charge with the EEOC or California Fair Employment and Housing Department ("CFEH"). Throughout 1996 and 1997, Douglas was unrepresented by counsel.

Douglas filed a discrimination charge with the federal EEOC on April 9, 1997. On February 23, 1998, the EEOC issued a "cause finding," based on its determination that the CYA color vision requirement for the Group Supervisor position violated the ADA. Douglas filed suit in federal court in July 1998, alleging violations of Title I of the ADA and Section 504 of the Rehabili-

tation Act of 1973.[1] Douglas sought money damages and injunctive relief.[2]

CYA moved for summary judgment on the grounds that Douglas's ADA claim was barred for failure to timely exhaust his administrative remedies, and that his Rehabilitation Act claim was filed after the statute of limitations had expired. Douglas defended against summary judgment by arguing that both his ADA and Rehabilitation Act claims were filed timely under a continuing violations theory. Douglas also argued that if the court found the Rehabilitation Act claim untimely, it should apply equitable tolling or estoppel to save the claim. On August 27, 1999, the district court rejected each of these theories and granted summary judgment to CYA on both the ADA and Rehabilitation Act claims. Douglas timely appealed.

## II.

Before addressing the timeliness of Douglas's claims, we first consider California's new argument that it is protected from suit in federal court by the Eleventh Amendment. California relies upon the Supreme Court's recent decision in *Board of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). In *Garrett*, the Supreme Court held that ADA Title I claims against states for money damages are barred by the Eleventh Amendment. *Id.* at 968. Although *Garrett* was decided in February, 2001, California waited until May 21, 2001, two weeks before oral argument was scheduled, to notify the court of *Garrett* and assert the Eleventh Amendment defense. We ordered supplemental briefing to address the impact of *Garrett* on the instant case.

### A.

States are protected by the Eleventh Amendment from suits brought by citizens in federal court. *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). There are only three exceptions to this general rule. First, a state may waive its Eleventh Amendment defense. *College Sav. Bank*, 527 U.S. at 670, 119 S.Ct. 2219, (citing *Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883)). Second, Congress may abrogate the States' sovereign immunity by acting pursuant to a grant of constitutional authority. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Third, under the *Ex parte Young* doctrine, the Eleventh

---

**1.** Title I of the ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Section 504 of the Rehabilitation Act similarly provides: "No otherwise qualified individual with a disability in the United States [defined elsewhere] shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or un-

der any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a).

**2.** In the fall of 1998, after filing suit, Douglas learned that the CYA was testing again for the Group Supervisor position. Douglas asked numerous CYA personnel members if passing the color vision test was still a requirement. He learned that the policy remained in effect. He was also told by a Senior Group Supervisor that to be hired he would need to pass the Farnsworth D–15 color vision test. Based on this information, Douglas did not apply for the 1998 examination.

Amendment does not bar a "suit against a state official when that suit seeks ... prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

■ The central question in *Garrett* was whether Congress validly abrogated the states' Eleventh Amendment immunity under Title I the ADA. 121 S.Ct. at 961. In recent years, the Supreme Court has imposed a two-part inquiry for determining whether Congress acts within its powers when it attempts to abrogate the states' Eleventh Amendment immunity. *See Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114. First, courts must ask "whether Congress unequivocally expressed its intent to abrogate" the states' immunity in the legislation itself. *Kimel*, 528 U.S. at 73, 120 S.Ct. 631. If the answer to this first inquiry is yes, then courts must next ask "whether Congress acted pursuant to a valid grant of constitutional authority." *Id.*

■ Congress acts pursuant to a valid grant of constitutional authority under § 5 of the Fourteenth Amendment when it enacts legislation with a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* (citing *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). This "congruence and proportionality" test requires Congress to identify and document the Fourteenth Amendment historical wrong that it seeks to remedy. Congress then must enact a statute that is proportional to its remedial goal. *See Florida Prepaid Postsecondary Ed. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639–40, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *City of Boerne*, 521 U.S. at 525, 531, 117 S.Ct. 2157.

At the time the instant case was pending before the district court, the circuit courts were divided over whether Congress validly exercised its power under § 5 of the Fourteenth Amendment by authorizing suits against the states under the ADA. *Compare Dare v. State of Calif.*, 191 F.3d 1167, 1175 (9th Cir.1999) (holding that the ADA was a "congruent and proportional" response to disability discrimination by state governments), and *Muller v. Costello*, 187 F.3d 298, 308–09 (2d Cir.1999) (same), *with Alsbrook v. City of Maumelle*, 184 F.3d 999, 1007 (8th Cir.1999) (en banc) (holding that the ADA was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment).

In *Garrett*, the Supreme Court held that claims brought under Title I of the ADA against states for money damages are barred by the Eleventh Amendment. *Garrett*, 121 S.Ct. at 968. The Supreme Court concluded that although Congress unequivocally expressed its intent that the ADA would abrogate a state's Eleventh Amendment immunity, Congress acted outside of the scope of its § 5 powers under the Fourteenth Amendment because the ADA failed the "congruent and proportionality test." *Id.* at 967–68. The Court found that Congress failed to document sufficient evidence of a pattern of irrational state discrimination against people with disabilities in state employment. *Id.* at 965 (criticizing the lengthy congressional record documenting discrimination as anecdotal and overly broad). The Court also found that the "rights and remedies created by the ADA" were not "proportional and congruent" to the problem of employment discrimination against persons with disabilities. *Id.* at 966.

In light of *Garrett*, California argues that Douglas's claims for damages under Section 504 of the Rehabilitation Act and Title I of the ADA are barred by the Eleventh Amendment. We address each of these arguments in turn.

## B.

■ Douglas contends that his Rehabilitation Act claim survives *Garrett* because California has waived its sovereign immunity by accepting Rehabilitation Act funds. We agree.

In *Clark v. State of California*, 123 F.3d 1267, 1271 (9th Cir.1997), we held that states are subject to suit in federal court under the Rehabilitation Act if they accepted federal Rehabilitation Act funds. In so holding, we relied upon the Supreme Court's instruction in *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 247, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), that a state may waive its immunity by "accept[ing] federal funds where the funding statute 'manifests a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity.'" *Clark*, 123 F.3d at 1271 (quoting *Scanlon*, 473 U.S. at 247, 105 S.Ct. 3142). Based on the clear waiver set forth in the Rehabilitation Act,[3] we concluded that by accepting federal Rehabilitation Act funds, the state waived its Eleventh Amendment immunity. *Id.*

Other circuits have reached the same conclusion. In *Jim C. v. United States*, 235 F.3d 1079 (8th Cir.2000) (en banc), the Eight Circuit en banc reasoned that Section 504's explicit waiver of sovereign immunity is a valid exercise of Congress's spending power and held that by accepting federal Rehabilitation Act funds, states waive their immunity with regard to this section. *Id.* at 1080. The Fourth Circuit referred to the Rehabilitation Act as the classic example of Congress conditioning a state's receipt of federal funding on acceptance of a state's waiver of sovereign immunity. *See Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279, 292 (4th Cir.2001) ("[A]ny State reading [the Rehabilitation Act's explicit waiver of sovereign immunity] would clearly understand that, by accepting Title IX funding, it was consenting to resolve disputes regarding alleged violations of the Act's anti-discrimination provisions in federal court."). *See also Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir.2000) ("the Rehabilitation Act is enforceable in federal court against recipients of federal largess"); *Sandoval v. Hagan*, 197 F.3d 484, 493 (11th Cir.1999) (describing the Rehabilitation Act's waiver as a "clear" waiver of state sovereign immunity in exchange for federal funds), *overruled on other grounds, Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).[4]

Our decision in *Clark*—that a state was not immune to suit under the Rehabilitation Act—alternatively rested on our conclusion that Congress, acting pursuant to its powers under § 5 of the Fourteenth Amendment, abrogated the states' Eleventh Amendment immunity with regard to the Rehabilitation Act. *Clark*, 123 F.3d at 1271. This alternative holding is of questionable validity in light of *Garrett*'s determination that Congress acted outside of its powers by attempting to abrogate the states' Eleventh Amendment immunity in enacting the ADA. *See Clark*, 123 F.3d at 1270 ("[T]he purpose of both the ADA and section 504 of the Rehabilitation Act is to prohibit discrimination against the disabled."). CYA argues strenuously that *Garrett* requires us to overrule *Clark*'s holding that Congress validly abrogated

---

**3.** "A State shall not be immune under the Eleventh Amendment ... from any suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." *Id.* at 1271 (quoting 42 U.S.C. § 2000d–7).

**4.** The Supreme Court in *Sandoval* only considered the question whether Title VI includes a private right of action to enforce disparate-impact violations. The Court did not address the Eleventh Amendment issue.

the states' immunity under the Rehabilitation Act. CYA, however, does not challenge the validity, in light of *Garrett*, of our alternative holding in *Clark* that by accepting federal Rehabilitation Act funds a state waives its Eleventh Amendment immunity with regard to the Rehabilitation Act. If we conclude that California waived its sovereign immunity by accepting Federal Rehabilitation Act funds, we need not reach the question whether Congress validly abrogated the states' sovereign immunity under the Rehabilitation Act.

The majority of district courts which have decided cases after *Garrett* have held that the Eleventh Amendment does not protect states that accept federal Rehabilitation Act funds from suit under the Rehabilitation Act in federal court. *See Patricia N. v. Lemahieu*, 141 F.Supp.2d 1243, 1250 (D.Haw.2001) (following the conclusion in *Dare* and *Clark* that Rehabilitation Act claims are not barred by the Eleventh Amendment); *Frederick L. v. Dept. of Public Welfare*, 157 F.Supp.2d 509, 523

(E.D.Pa.2001) ("[T]he Eleventh Amendment is not a bar to suit in federal court for violations of section 504 [of the Rehabilitation Act]."); *Maull v. Division of State Police, Dept. of Public Safety, State of Del.*, 141 F.Supp.2d 463, 472 (D.Del. 2001) ("declin[ing] to apply *Garrett* to Plaintiff's claim under the Rehabilitation Act"); *Boudreau ex rel. Boudreau v. Ryan*, No. 00 C 5392, 2001 WL 840583, *2 (N.D.Ill. May 2, 2001) ("[T]he Eleventh Amendment does not bar the plaintiffs' Rehabilitation Act claim."); *but see Pugliese v. Arizona Dept. of Health and Human Services*, 147 F.Supp.2d 985, 991 (D.Ariz.2001) (holding that Arizona did not waive its immunity under the Rehabilitation Act by accepting federal Rehabilitation Act funds).[5]

█ Accordingly, we hold that by accepting federal Rehabilitation Act funds, California has waived its sovereign immunity under the Rehabilitation Act. We adhere to our decision in *Clark* and conclude that the clear waiver language of the Re-

---

5. The only district court to rule that acceptance of federal Rehabilitation Act funds does *not* waive immunity under the Act relied not upon *Garrett*, but upon the Supreme Court's decision in *College Sav. Bank. Pugliese*, 147 F.Supp.2d at 990. Such reliance is misplaced. In *College Sav. Bank*, the Supreme Court revisited the doctrine of constructive waiver as cast in *Parden v. Terminal Ry. of Alabama State Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). In *Parden*, the Court held that although the Federal Employers Liability Act ("FELA") did not expressly condition participation in an interstate commerce activity upon waiver of immunity under FELA, a state constructively waived its sovereign immunity defense by operating a railroad in interstate commerce. *College Sav. Bank*, 527 U.S. at 677, 119 S.Ct. 2219 (citing *Parden*, at 192, 84 S.Ct. 1207) ("By enacting [FELA] ... Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act.").

In *College Sav. Bank*, the Supreme Court overruled the constructive waiver doctrine in

the *Parden* context. *Id.* at 680, 119 S.Ct. 2219. While refusing to recognize waivers implied from participation of a state in a federal program, the Supreme Court carefully distinguished the "fundamentally different" case of constructive waivers implied from a state's acceptance of federal funds. *Id.* at 686, 119 S.Ct. 2219. "Conditions attached to a state's receipt of federal funds are simply not analogous to *Parden*-style conditions attached to a State's decision to engage in otherwise lawful commercial activity." *Id.* at 678 n. 2, 119 S.Ct. 2219. *College Sav. Bank* stands as a clear reaffirmation that Congress may exercise its spending power to condition the grant of federal funds upon the states' agreement to waive Eleventh Amendment immunity. *Id.* at 686, 119 S.Ct. 2219; *accord Jim C.*, 235 F.3d at 1081 (*citing College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. 2219) ("Specifically, Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly.").

habilitation Act conditions the receipt of federal funds under the Rehabilitation Act upon a state's agreement to forgo the Eleventh Amendment defense. We therefore conclude that Douglas's Rehabilitation Act claim is not barred by the Eleventh Amendment.

## C.

■ After *Garrett*, it is clear that states are immune from suits for money damages under Title I of the ADA. *Garrett*, 121 S.Ct. at 968, 121 S.Ct. 955. The only remaining question concerning the viability of Douglas's ADA claim is whether California waived its sovereign immunity in this case.[6] Although a waiver of Eleventh Amendment immunity must be unambiguous, a state may implicitly waive its sovereign immunity "by conduct that is incompatible with an intent to preserve that immunity." *Hill v. Blind Indus. and Servs. of Maryland*, 179 F.3d 754, 758 (9th Cir.1999), *amended by* 201 F.3d 1186 (9th Cir.2000); *see also Amanda J. ex rel. Annette J. v. Clark County School District*, No. 00–17157, 2001 WL 902125, *16 n. 7 (9th Cir. Aug.13, 2001) (holding, in a case similarly briefed before *Garrett*, but decided after *Garrett*, that "both parties waived any rights they may have had to invoke the Eleventh Amendment defense of sovereign immunity by their extensive participation in this litigation").

■ As noted above, CYA did not raise the Eleventh Amendment defense

before the district court, nor did it raise the defense in its appellate brief to this court. *Cf. Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir.2001) (finding that California preserved its immunity defense by raising the Eleventh Amendment in its answer before *Garrett* was decided). Douglas argues that CYA was aware of the sovereign immunity defense under the Eleventh Amendment, but elected not to raise it. Whether CYA waived the immunity defense below by its conduct in this case turns on factual disputes.[7] Because the issue was not raised before the district court, we do not have the benefit of a factual record. Rather than evaluate the waiver argument in the absence of a record, we remand the issue to the district court.[8] *Cf. Katz v. Regents of the Univ. of Calif.*, 229 F.3d 831, 834 (9th Cir.2000) (finding that California waived its immunity to suit by not raising the defense before the district court and submitting a declaration of counsel which purports to waive the State's immunity). We note that on remand, CYA, as the "entity invoking the Eleventh Amendment immunity, bears the burden of asserting and proving those matters necessary to establish its defense." *In re Lazar*, 237 F.3d 967, 974 (9th Cir.2001) (quoting *Hill*, 201 F.3d at 1186).

## III.

■ The district court granted summary judgment to CYA on the ground that both the ADA and Rehabilitation Act

---

6. Because Douglas has not named a state official as a defendant in this suit, the *Ex parte Young* doctrine does not apply. *See Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

7. Douglas maintains that the Deputy Attorney General told his trial counsel that he was instructed not to raise the Eleventh Amendment immunity defense in suits under the ADA. This allegation is not part of an evidentiary record.

8. Because the Eleventh Amendment is more appropriately considered an affirmative defense than a jurisdictional bar, we consider the merits of Douglas's argument that his ADA claim was timely. *See Hill*, 179 F.3d at 760 ("[T]he Eleventh Amendment is not a true limitation upon the court's subject matter jurisdiction, but rather a personal privilege that a state may waive.").

claims were time barred. Douglas contends that both claims are timely under the continuing violations doctrine. The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's rights "up to a point in time that falls within the applicable limitations period." *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir.1982). We review de novo the district court's grant of summary judgment and consider the evidence in the light most favorable to the non-moving party. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). To survive summary judgment, Douglas need only demonstrate that genuine issues of material fact exist as to whether the continuing violations doctrine applies and CYA's discriminatory vision policy extended into the relevant period. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir.1998).

█ We have recognized two methods by which a plaintiff may establish a continuing violation. *Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir.1997). First, the plaintiff may show a serial violation by pointing to a series of related acts against one individual, of which at least one falls within the relevant period of limitations. *Id.*; *Morgan v. Nat'l RR Passenger Corp.*, 232 F.3d 1008 (9th Cir.2000).[9] For example, in a case alleging discrimination on the basis of national origin, we permitted the plaintiff to introduce acts of discrimination by his employer that occurred outside of the statute of limitations period because they were sufficiently related to later, timely incidents of discrimination. *Sosa v. Hiraoka*, 920 F.2d 1451,

1455 (9th Cir.1990). Second, a plaintiff may show a "systematic policy or practice of discrimination that operated, in part, within the limitations period-a systemic violation." *Morgan*, 232 F.3d at 1015–16. In *Gutowsky*, for example, we concluded that the plaintiff's case was timely because she alleged the existence of "widespread policy and practices of discrimination of which she complains continued every day of her employment, including days that fall within the limitations period." 108 F.3d at 260.

█ Douglas alleges that CYA's color vision requirement constitutes a systemic policy of discrimination. A systemic violation claim "requires no identifiable act of discrimination in the limitations period, and refers to general practices or policies, such as hiring, promotion, training and compensation." *Provencher v. CVS Pharmacy, Div. Of Melville Corp.*, 145 F.3d 5, 14 (1st Cir.1998). "In other words, if both discrimination and injury are ongoing, the limitations clock does not begin to tick until the invidious conduct ends." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 183 (1st Cir.1989).

Our decisions applying the systemic policy or practice method of demonstrating a continuing violation have largely arisen in the context of placement or promotion discrimination cases. *See Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1480 (9th Cir.1989); *Morgan*, 232 F.3d at 1016. We are now confronted with a case where the plaintiff alleges discrimination in hiring. We must therefore consider whether the maintenance of a systemic discrimination policy, when combined with repeated efforts by the plaintiff

---

9. The Supreme Court granted certiorari in this case to resolve a circuit conflict over the application of the "related series" continuing violations doctrine in hostile work environment cases. *Nat'l R.R. Passenger Corp. v. Morgan*, —— U.S. ——, 121 S.Ct. 2547, 150 L.Ed.2d 715 (2001). Because the present case involves the second method of establishing a continuing violation—a systemic violation—the Supreme Court's decision is unlikely to control this case.

to gain employment, extends the accrual of the limitations period in such a case.[10]

■ We begin our analysis of the timeliness of Douglas's claims by reviewing the statute of limitations periods and the facts relevant to Douglas's assertion that his claims were timely under a continuing violation theory. The relevant periods of limitations are different for Douglas's Rehabilitation Act and ADA claims. A one-year statute of limitations applies to the Rehabilitation Act Section 504 claim.[11] Because Douglas filed suit in federal court on July 6, 1998, the Rehabilitation Act claim is barred by the statute of limitations if the claim accrued before July 5, 1997. Douglas's ADA claim is timely if he filed an administrative charge with the EEOC within 300 days of the alleged violation.[12] Douglas filed his discrimination charge with the EEOC on April 18, 1997. Applying the 300 day period, Douglas's claim must relate to discrimination that occurred on or after June 22, 1996 to be timely.

Douglas applied for the position of group supervisor in 1994, and again in 1996. He submitted an affidavit stating that applications remain on file for approximately two years because the CYA only administers the application test every two years. Douglas argues that the continuing violations doctrine should apply because although he was denied the position on March 1, 1996, he applied again for the job in October of 1996. Douglas appealed the denial of his first 1994 application, and the appeal was denied by the State Personnel Board in February of 1997. There is no evidence in the record indicating a response by CYA to Douglas's second job application, submitted in the fall of 1996. By the time of the third application period, the fall of 1998, Douglas had filed suit.

Applying the continuing violations doctrine to these facts, we are guided by two earlier Ninth Circuit decisions. In *Domingo v. New England Fish Co.*, 727 F.2d 1429 (9th Cir.1984), *amended* 742 F.2d 520 (9th Cir.1984), we considered a class action suit against a cannery operator involving allegations of discrimination on the basis of race in hiring and promotions. The plain-

---

10. We need not decide the broader question whether the maintenance of a systemic policy of discrimination *alone* is enough to extend the limitations period in a failure to hire case. We note that the Fifth Circuit has answered this question in the negative, reasoning that "[i]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely." *Abrams v. Baylor Coll. of Med.*, 805 F.2d 528, 533 (5th Cir.1986). In our view, this rationale ignores the fact that the employer may end the period of exposure to litigation by disavowing the discriminatory policy.

11. The statute of limitations for the Rehabilitation Act Section 504 claim is provided by the analogous state law. In this case, both parties agree that California's one-year statute of limitations for personnel injuries governs Douglas's Section 504 claim. *See Wilson v. Garcia*, 471 U.S. 261, 276–80, 105 S.Ct. 1938,

85 L.Ed.2d 254 (1985); Cal. Civ. Proc. § 340(30).

12. Before filing an ADA suit, a plaintiff must timely file a discrimination charge with the EEOC. 42 U.S.C. § 12117(a). Filing a timely charge is a statutory condition that must be satisfied before filing suit in federal court. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In order to be timely, the plaintiff must file a discrimination charge with the EEOC within 180 days after the alleged violation. 42 U.S.C. § 2000e–5(e). If the plaintiff files a charge with an appropriate state agency, he or she must file the charge with 300 days after the alleged violation. The EEOC in Douglas's case referred the charge to the California Department of Fair Employment and Housing, triggering the 300–day limitations period. *EEOC v. Comm. Office Products Co.*, 486 U.S. 107, 111, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988).

tiffs argued that their claims were saved from the time bar by the fact that the discriminatory hiring and promotion polices continued until the plaintiffs brought suit. *Id.* at 1443. We required the plaintiffs to demonstrate that because of the discriminatory policy, they were either discriminated against or "exposed to discrimination" during the limitations period. *Id.*

Almost a decade later, we again addressed the issue whether a case was timely under a continuing violations theory based on an alleged systemic discrimination in hiring. *EEOC v. Local 350, Plumbers and Pipefitter,* 998 F.2d 641, 643 (9th Cir.1993). The EEOC filed an Age Discrimination in Employment Act suit on behalf of union members who were excluded from hiring lists on the ground that they received pension benefits. *Id.* at 643. We noted that the union's policy that excluded retirees from the hiring lists applied to the class members as early as 1984, five years earlier. *Id.* at 644. We found that the action was not barred by the relevant statute of limitations, because the discriminatory policy prohibiting retirees from joining the hiring lists continued. *Id.* ("Here, Local 350's allegedly discriminatory policy was in effect when [the plaintiff] first encountered [the policy] in 1984 and remains in force today. Thus, under the continuing violations doctrine, relief for [the plaintiff] is not barred."). Although we did not cite *Domingo* in our analysis in *Local 350,* the two decisions are consistent. In *Local 350,* the plaintiffs, as union members, continued to be "exposed" to the discriminatory hiring policies of the union. ▬▬▬ Thus, under *Domingo* and *Local 350,* the critical inquiry is whether in this case, Douglas has introduced facts,

which if viewed in the light most favorable to him, raise material questions about whether he was "exposed" to CYA's discriminatory policy during the period of limitations. We conclude that Douglas raised material questions of fact about whether CYA continued to discriminate against him by not considering or responding to his pending application during the 1996–1998 period. When Douglas applied in 1994, he proceeded successfully through each of the hiring steps, until he reached the vision test at the end. We have no reason to believe that Douglas was less qualified when he re-applied in 1996. It is a reasonable inference from these facts that CYA failed to respond to Douglas's 1996 application throughout the 1996–1998 period because of its discriminatory policy about the vision test. In any event, by reapplying in the fall of 1996 during the window for applications for hiring in 1996–1998, Douglas remained "exposed" to CYA's discriminatory vision policy during the entire 1996–1998 period. This exposure renders his claims timely by extending the claims past the June 22, 1996 deadline for filing his ADA claim, and the July 5, 1997 deadline for filing his Rehabilitation Act claim.

In sum, after reviewing the facts in the light most favorable to Douglas, we conclude that he has raised material facts about whether his claim extended into 1997 and 1998, making his claims under the ADA and Rehabilitation Act timely.[13] Accordingly, we reverse the district court's grant of summary judgment.

## CONCLUSION

We conclude that California has waived its sovereign immunity with regard to Sec-

---

13. We note that in some circuits, "[e]ven where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that

he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." *Provencher,* 145 F.3d at 14. This is often referred to as the "notice requirement," and typically applies in cases

tion 504 of the Rehabilitation Act by accepting Rehabilitation Act funds. With respect to the ADA claim, we REMAND to the district court the question whether the state waived its Eleventh Amendment immunity under the ADA in this case. We REVERSE the district court's grant of summary judgment on both the Rehabilitation Act and ADA claims because we conclude that the claims were timely filed under the continuing violations doctrine.

REVERSED and REMANDED.

involving serial violations. However, "[t]his court has never adopted a strict notice requirement as the litmus test for application of the continuing violation doctrine." *Morgan,* 232 F.3d at 1015. In our view, the continuing violations doctrine would apply to Douglas's claim in any case because the touchstone of the notice inquiry is whether it would be reasonable to expect the plaintiff to sue before the statute expired. *See Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167 (7th Cir.1996). In this case, we cannot say Douglas acted unreasonably by pursuing each avenue of appeal identified to him, and by reapplying for the position.